JTH TAX, INC. d/b/a/ Liberty Tax Service, et al., Plaintiffs,

v.

H & R BLOCK EASTERN TAX SERVICES, INC., et al., Defendants.

No. CIV. A. 2:00CV51.

United States District Court,
E.D. Virginia.
Norfolk Division.

Feb. 23, 2001.

928

Peter Vincent Chiusano, Willcox & Savage, Norfolk, VA, Walter Dekalb Kelley, Jr., Willcox & Savage, Norfolk, VA, Robert L. O'Donnell, Richard Hooper Ottinger, Vandeventer Black LLP, Norfolk, VA, Glen Michael Robertson, Payne, Gates, Farthing & Radd, P.C., Norfolk, VA, Frank Alwin Edgar, Jr., Willcox & Savage, P.C., Norfolk, VA, Carl Jay Khalil, JTH Tax, Inc., Virginia Beach, VA, Daniel A. Edelman, Cathleen M. Combs, Anne M. Burton, Christopher R. Zink, Edelman, Combs & Latturner, Chicago, IL, for JTH Tax, Inc.

Carl Jay Khalil, JTH Tax, Inc., Virginia Beach, VA, Glen Michael Robertson, Payne, Gates, Farthing & Radd, P.C., Norfolk, VA, for Thomas Bennett, Jama Corleto, Charles Dawson, Landstown Preschool, Inc., James Forguson, Ann Marie Forguson, A & J Tax Service, Annette Hobbs, Donnie Hobbs, Danda Inc., Vincent Jackson, Daniel Lepkowski, Freedom Tax, Inc., Charles Lovelace, Creative Management Systems, Inc., Kathleen Ponte, John Seal, Marcia Seal, JMS Tax, Inc., Syed Sherazi, B & L Investment, Inc., Richard Simon, Dennis Stuver, DCM & B, LLC.

Benita Webster Ellen, Hunton & Williams, Norfolk, VA, Gregory N. Stillman, Hunton & Williams, Norfolk, VA, Rodney F. Page, Bryan Cave LLP, Washington, DC, Daniel C. Schwartz, Elaine F. Foreman, Bryan Cave LLP, Washington, DC, N. Louise Ellingsworth, Mark W. Brennan, Nilesh S. Patel, Bryan Cave LLP, Kansas City, MO, for H & R Block Eastern Tax Services, Inc.

Robert L. O'Donnell, Richard Hooper Ottinger, Vandeventer Black LLP, Norfolk, VA, Carl Jay Khalil, JTH Tax, Inc., Virginia Beach, VA, Daniel A. Edelman, Cathleen M. Combs, Edelman, Combs & Latturner, Chicago, IL, for Frank Grim.

Benita Webster Ellen, Hunton & Williams, Norfolk, VA, Gregory N. Stillman, Hunton & Williams, Norfolk, VA, N. Louise Ellingsworth, Mark W. Brennan, Nilesh S. Patel, Bryan Cave LLP, Kansas City, MO, for H & R Block Tax Service, Inc.

### *CORRECTED MEMORANDUM OPINION & ORDER*

JACKSON, District Judge.

This matter is before the Court for decision following a bench trial. JTH Tax, Inc. ("Liberty Tax Service") and thirteen Liberty Tax Service franchises (collectively, "Plaintiffs") allege that H & R Block, Inc. and H & R Block Eastern Tax Services, Inc. (collectively, "Defendants") engaged in false and misleading advertising in their offering of a "no additional charge refund anticipation loan" ("NACRAL") during the 2000 tax season in the Hampton Roads, Virginia area in violation of the Lanham Act ("Act"). *See* 15 U.S.C. § 1125(a) (1994). Both parties briefed this matter in post-trial memoranda filed on November 27, 2000, and all transcripts were filed by January 19, 2001. Accord-

ingly, this matter is now ripe for judicial determination.

## I. FACTS

Plaintiff JTH Tax, Inc., d/b/a Liberty Tax Service is a corporation duly organized and existing under the law of the state of Delaware with its corporate headquarters and principal place of business in Virginia Beach, Virginia. Liberty Tax Service is a franchisor of tax preparation offices and has been in business since 1996. In the calendar year 1999 tax season, Liberty Tax Service and its franchisees operated 35 stores in the United States, and through a subsidiary, 230 offices in Canada. Calendar year 2000 was the first year of its tax preparation services in Virginia, where, through franchisees,[1] Liberty Tax Service started 25 offices in the Tidewater area with 20 of the 25 offices within Norfolk, Portsmouth, Virginia Beach, Chesapeake and Suffolk, which is the single largest concentration of new or existing Liberty Tax Service offices in the United States.

Defendants H & R Block Eastern Tax Services, Inc. and H & R Block Tax Services, Inc. are Missouri corporations with their principal place of business in Kansas City, Missouri. Block Eastern and its affiliates are the largest provider of individual income tax preparation services in the United States. H & R Block prepared approximately one out of every three of the 50 million professionally prepared income tax returns in the United States and electronically filed over 50% of all federal income tax returns in the United States in 1999. H & R Block Eastern Tax Services has approximately 31 company owned offices in Norfolk, Virginia Beach, Portsmouth, and Chesapeake. H & R Block Tax Services is affiliated with H & R Block Eastern and participated in, developed, provided and placed some of the advertising materials used by H & R Block Eastern. H & R Block Tax owns the copyright to the advertisements at issue in this action.

Competition in the tax preparation industry in the Hampton Roads area is intense. In addition to H & R Block's presence during the 2000 tax season, H & R Block's single largest competitor, Jackson Hewitt, operated approximately 70 offices in the Hampton Roads area during the same time. *See* Tr. 483. During the 2000 tax season, approximately 25 Liberty Tax Service offices were operated in the Hampton Roads area. *See* Tr. 483–84. Thirteen plaintiff-franchisees operated 19 offices. This tax season represented Plaintiffs' largest roll-out of new franchises.

During the 2000 tax season, Defendants offered a new loan product in selected areas across the country: the NACRAL. A standard refund anticipation loan ("RAL") is a short-term loan against the consumer's anticipated tax refund from the Internal Revenue Service ("IRS"). Whereas the IRS will process refund

---

1. Liberty Tax Service has thirteen franchisees who are also plaintiffs in this case. Thomas Bennett, formerly owned and operated a Liberty Tax Service franchise in Virginia Beach, Virginia. Jama Corleto Marcil, Kathleen Ponte, and Richard Simon each own and operate a Liberty Tax Service franchise in Virginia Beach, Virginia. Several plaintiffs own and operate franchises in Virginia Beach through Virginia corporations or limited liability companies: Landstown Preschool Inc. and its principal Charles Dawson; DANDA, Inc., and its principals, Annette and Donnie Hobbs; JMS Tax, Inc., a Virginia Corporation, and its principal, John and Marcia Seal; DCM & B, LLC and its principal, Dennis Stuver. In Norfolk, several plaintiffs own and operate franchises: Vincent Jackson; Freedom Tax, Inc. and its principal, Daniel Lepkowski (two offices); and Creative Management Systems, Inc. and its principal, Charles Lovelace, previously owned and operated a Liberty Tax Service franchise with two offices in Norfolk, Virginia. In Portsmouth and Suffolk, A & J Tax Service and its partners, James and Ann Marie Forguson, own and operate Liberty Tax Service franchises. B & L Investment, Inc. and its principal, Syed Sherazi, own and operate Liberty Tax Service franchises with an office formerly in Norfolk, Virginia and an office in Chesapeake, Virginia.

checks in a two week or longer period, a refund anticipation loan can be disbursed from a lender to a consumer within one or two days. The consumer receives a loan disbursement check from the lending institution and the consumer's IRS refund will be directly deposited to the lending institution once the IRS processes it. Unlike Defendants' usual refund anticipation loan products, the NACRAL featured no interest and no fees. Defendants achieved this arrangement by directly paying lending fees to Defendants' third-party lender, Household Bank, a Delaware corporation. In the Hampton Roads area, Defendants charged consumers one price for tax preparation services, regardless if one accepted or declined the NACRAL.

Notwithstanding the absence of any interest or fees, NACRALs do have several characteristics differentiating them from actual IRS refund checks. To qualify for the NACRAL, consumers had to make certain certifications, including a statement regarding past bankruptcies. In the event of an inadequate IRS refund, consumers would be subject to collection costs and attorneys' fees. In addition, consumers taking NACRALs must agree to "cross-collection," where banks assist one another in collecting delinquent debts from consumers by withholding IRS refund amounts. When cross-collection occurs, the consumer will owe money to the lending institution because the IRS refund will no longer be sufficient to satisfy the short-term loan.

NACRALs and RALs have a special appeal among lower income consumers of tax preparation services, the primary demographic of Defendants' and Plaintiffs' clientele. Because these groups live within tight budgets, the rapid processing of tax returns can mean the difference between making or missing a rent or credit card payment. In addition, by virtue of their financial status, these consumers, as a group, are especially sensitive to the loan features of NACRALs. They may have past bankruptcies and outstanding debts subject to cross-collection.

During the 2000 tax season in Hampton Roads, Defendants advertised their NACRAL product through posters, newspapers, radio and television commercials, and through direct mail as a "refund," "refund amount," and "a check in the amount of your refund." The IRS, however, requires authorized IRS e-file providers, such as Defendants and Plaintiffs, to disclose their products as loans and not refunds in their advertisements. IRS Publication 1345, § 12(.09) of Revenue Procedure 98–50, 1998 WL 638827 provides that: "In advertising the availability of a RAL, an Authorized IRS e-file Provider and a financial institution must clearly (and, if applicable, in easily readable print) refer to or describe the funds being advanced as a loan, not a refund; ... *it must be made clear in the advertising that the taxpayer is borrowing against the anticipated refund and not obtaining the refund itself from the financial institution.*" (emphasis added). Defendants, notwithstanding considerable state consumer litigation over their use of the term "refund," made no such disclaimer.

As a result of their advertisements, Defendants dramatically increased their client base. In the Hampton Roads area, the number of returns processed increased 24.8%, 24% more than Defendants' increase in areas of Virginia where they did not run their advertisements touting the loans as "refunds." Although Defendants attribute their client growth to their NACRAL program's bundled price and not their false advertising, evidence at trial established that Plaintiffs competed vigorously for a foothold in the market by cutting prices, at times even offering free returns, in order to retain clients. Defendants' profits for tax season 2000 declined relative to past years, but they achieved their stated goal of increasing a client base to whom they could cross-market year-round services, including mortgages and financial services.

On February 17, 2000, Defendants signed a consent order agreeing to refrain from advertising refund anticipation loans as a "refund," "refund amount," or "amount of your refund." One week later, however, Defendants continued to run offending advertisements. Plaintiffs now seek recovery under the Act alleging Defendants employed false and misleading advertisements to market their tax preparation services.

In addition to the findings made elsewhere in this Memorandum Opinion and Order, the Court makes the following factual findings:

1. The filing of a tax return electronically with the IRS enables tax preparers to offer to the public the ability to receive their actual tax refund in about two weeks after preparing the tax return.

2. Electronic tax filing has allowed tax preparers and partnered banking institutions to offer RALs based upon the taxpayer's anticipated tax refund. If qualified, the customer receives this loan, less any tax preparation or applicable bank fees, typically within two (2) days.

3. RALs appeal to lower to moderate income consumers who desire or have need of receiving money more quickly than the IRS's standard two week processing. Often, the latter consumers have had past problems with loans, bankruptcies, and credit reports.

4. When a customer receives a RAL, the customer is not receiving his or her actual refund. If approved, the customer has received a loan based upon his or her anticipated refund. The IRS sends the actual refund to the bank to satisfy the loan.

5. Collection activity for outstanding federal tax debt or a debt from a prior RAL delinquency can reduce the dollar amount received by taxpayers using RALs.

6. Defendants' NACRAL does not charge interest or bank fees. NACRALs do, however, subject consumers to cross-collection activity from banking institutions, collection costs and attorneys' fees in the event of a diminished tax return, as well as mandatory certifications regarding past bankruptcies.

7. Tonya Williams received a NACRAL from Household Bank after receiving tax preparation services from Defendants. The IRS transmitted her refund to Household bank to satisfy the NACRAL.

8. Defendants' "Spend more quality time with your refund" advertisement without the fine print disclaimer is literally false. See Ex. 11 (*The Flagship*, Feb. 3, 2000); Ex. 12 (*The Flagship*, Feb. 10, 2000); Ex. 13 (*The Flagship*, Feb. 17, 2000); Ex. 14 (*The Gator*, Feb. 10, 2000); Ex. 15 (*The Gator*, Feb. 24, 2000).

9. Defendants' "Spend more quality time with your refund" advertisement with the fine print disclaimer is literally true but misleading false advertisement. See Ex. 8–10.

10. Defendants' Val–Pak coupon, in-store posters, and certain newspaper advertisements are literally true but misleading false advertisement. See Ex. 7; Ex. 16 (*The Flagship*, Jan. 27, 2000); Ex. 17 (*The Flagship*, Feb. 10, 2000); Ex. 18 (*The Flagship*, Feb. 24, 2000); Ex. 19 (*The Gator*, Jan. 27, 2000); Ex. 20 (*The Gator*, Feb. 10, 2000); Ex. 21 (*The Gator*, Feb. 24, 2000); Ex. 23–26.

11. Defendants' "Woo Hoo" television commercial is literally true but misleading false advertisement. See Ex. 27; Ex. 28.

12. Defendants' radio commercial is not false advertising. See Ex. 29. Defendants' yellow page listing, featuring Defendants' "Rapid Refund" mark, is not a false advertisement. See Ex. 30.

13. Where their testimony conflicts, the Court credits the expert witness testimony of Dr. Myron Glassman as more credible and convincing than the live testimony of Dr. Deborah Cowles. The Court finds the report of Dr. Glassman more credible than the joint report of Drs. Deborah Cowles and Pamela Kiecker.

14. Dr. Glassman's expert testimony and consumer surveys provided competent and probative evidence that Defendants' advertising was deceptive. Over 20% of consumers viewing Defendants' poster believed it deceptive as failing to state it was a loan.

15. Defendants acted maliciously, willfully, and in bad faith.

16. IRS Publication 1345, § 12(.09) of Revenue Procedure 98–50, 1998 WL 638827 provides that: "In advertising the availability of a RAL, an Authorized IRS e-file Provider and a financial institution must clearly (and, if applicable, in easily readable print) refer to or describe the funds being advanced as a loan, not a refund; that is, it must be made clear in the advertising that the taxpayer is borrowing against the anticipated refund and not obtaining the refund itself from the financial institution." Section 12(.02) also provides that "[a]n Authorized IRS e-file Provider must adhere to all relevant federal, state, and local consumer protection laws that relate to advertising and soliciting . . . ."

17. Defendants knew about the IRS requirement that they may not refer to a loan as a "refund."

18. Defendants had prior notice about not representing loans as "refunds" because they had entered into multiple consent orders with states regarding their deceptive use of "refund" in lieu of "loan" in advertisements.

19. Defendants targeted the newcomer Plaintiffs in the Hampton Roads area. Defendants' advertisements in Richmond and Roanoke, where Plaintiffs were not located, did not use the word "refund," "refund amount," or "amount of your refund" in lieu of "loan."

20. Defendants' internal study favoring the use of "refund" in advertisements as opposed to "loan" indicates an absence of mistake regarding the use of the term "refund" and its effect on consumers.

21. The false statements in Defendants' advertisements were material to consumers in that it was likely to affect a consumer's purchasing decision.

22. Dr. Glassman testified that 21.7% of those Defendants' surveyed stated that advertising a refund anticipation loan as a "refund" was more effective than advertising the product as a "loan."

23. Defendants' advertisements were in commerce.

24. Defendants ran the NACRAL program nationally in select parts of the country.

25. Defendants employed an out-of-state bank as the lending institution, transmitted IRS e-filings out-of-state to Massachusetts, and broadcast on radio and television in a designated market area encompassing parts of North Carolina and Virginia. Defendants used the United States mail to send false advertisements. Defendants distributed their false advertisements to their offices through the Internet. A sizeable portion of the tax preparation industry clientele in the Hampton Roads area is military personnel transplanted from other areas of the country.

26. NACRALs and RALs are profitable products for tax preparation services.

27. On the accounting testimony, the Court credits the testimony of Walter Stosch over Leon Hodge's testimony.

28. Defendants increased their returns in Hampton Roads 24.8%, a 24% increase over other areas in Virginia. This 24% increase represented 9,446 returns during calendar year 2000.

29. Non-party Jackson Hewitt is a major competitor in the Hampton Roads area with approximately 70 offices.

30. Defendants' average fee per client in Hampton Roads was $83.22.

## II. LEGAL STANDARD

The Lanham Act ("Act") provides that "[a]ny person who in connection with any services uses in commerce any false or

misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities of his or her services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1) (1994) (ellipses omitted).

■ In order to establish a claim of false advertising under the Act, Plaintiffs must prove by a preponderance of the evidence that: (1) Defendants made a false or misleading statement in a commercial advertisement about their services; (2) the statement(s) actually deceived or had a tendency to deceive a substantial segment of its audience; (3) the deception was material, in that it was likely to influence the purchasing decision; (4) Defendants caused their false statement(s) to enter interstate commerce; and (5) Plaintiffs have been or are likely to be injured as a result of the false statement(s), either by direct diversion of sales from themselves to Defendants or by a loss of goodwill associated with their services. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir.1998); *Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm.*, 19 F.3d 125, 129 (3d Cir.1994); *Black & Decker, Inc. v. Pro–Tech Power, Inc.*, 26 F.Supp.2d 834, 861–62 (E.D.Va.1998). Below the Court discusses each of these elements in Plaintiffs' Lanham Act claim.

## III. DISCUSSION

### A. False Statement

■ A false statement under the Act may be either (1) literally false as a factual matter or by necessary implication, or (2) literally true or ambiguous but implicitly convey a false impression, misleading in context, or likely to deceive consumers. *See C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare*, 131 F.3d 430, 434

(4th Cir.1997); *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir.1993).

### 1. Literally false advertisement

■ Whether an advertisement is literally false is an issue of fact, *see C.B. Fleet Co.*, 131 F.3d at 434, and depends on the trier of fact's determination of the message conveyed within its complete context. *See Rhone–Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 516 (8th Cir.1996).

■ In this case, the Court finds that Defendants' "Spend more quality time with your refund" advertisement without the fine print disclaimer is literally false, particularly when examined in the context of the whole advertisement. During the 2000 tax season, Defendants had *The Flagship* and *The Gator* military newspapers run this advertisement several times. *See* Ex. 11 (*The Flagship*, Feb. 3, 2000); Ex. 12 (*The Flagship*, Feb. 10, 2000); Ex. 13 (*The Flagship*, Feb. 17, 2000); Ex. 14 (*The Gator*, Feb. 10, 2000); Ex. 15 (*The Gator*, Feb. 24, 2000). The advertisement featured a couple lounging in a pool with the bold-faced copy "Spend more quality time with your *refund*." *Id.* (emphasis added). The advertisement inquired: "Why wait 6 weeks for your tax refund when H & R Block can give you *your refund amount* in as little as 2 days? And for no extra cost. Let us prepare your returns and for no extra charge we'll make sure you get a check *in the amount of your refund* that fast. hrblock.com or 1–800–HRBLOCK. CALL YOUR NEAREST H & R BLOCK OFFICE FOR DETAILS." *Id.* (emphasis added). After the first mention of "refund," no term in the advertisement contextualizes "amount of your refund" or "your refund amount" as referring to anything other than "refund." In reality, consumers did not spend any more time with their actual refunds. Instead, they each received a NACRAL from H & R Block's loan provider, Household Bank, in the amount of their tax refund, less Defendants' tax preparation fees. *See, e.g.*, Ex.

244a-g (test customer, Tonya Williams, received a loan disbursement check from Household Bank, less Defendants' tax preparation fees).[2] Defendants argued at trial that because NACRALs do not charge interest, origination or other loan fees, they are effectively not "loans" but "refund amounts." This characterization, however, neglects the other significant liabilities of a loan. Plaintiffs established that the no interest, no additional cost loan still carries obligations and conditions which refunds do not. Household Bank's NACRAL entails cross-collection of delinquent loans from other banks; attorneys' fee and collection costs; and extensive certifications including declarations about past bankruptcies. *See, e.g.*, 244a, ¶¶ 4, 5, 7, 9(B), 9(D) (loan application); Tr. 709–11.[3] In view of this difference between receiving a NACRAL versus a "refund," the advertisement is literally false.

## 2. Literally true but misleading advertisements .

A literally true but "misleading description of fact ... or misleading representation of fact" is also actionable. 15 U.S.C. § 1125(a). In this case, the Court finds that most of the advertisements discussed below are not literally false, but nonetheless misleading in their context and thus actionable.

### a. *Spend more quality time with your refund with the fine print disclaimer*

Defendants' "Spend more quality time with your refund" advertisement *with* the fine print disclaimer is literally true, but misleading. Unlike Defendants' other "Spend more quality time with your refund" advertisement, Defendants added a very small fine print disclaimer: "Re-

fund anticipation advance subject to qualification, received in 2 days, in most cases at participating offices." Ex. 8–10 (*The Virginian–Pilot*, Jan. 27, 2000, Feb. 9, 2000, Feb. 13, 2000). Viewed in the entire context of the advertisement, "Spend more quality time with your refund" is not literally false. The disclaimer saves the advertisement from literal falsity because "refund" is qualified in the disclaimer as a "refund anticipation advance." The word "advance," a synonym for loan, albeit easily mistaken for something other than a loan, is not literally false. But that "advance" may in some contexts be a synonym for "loan" does not save the advertisement from being misleading, notwithstanding its literal truth. Defendants' disclaimer is ineffective both because it is in tiny print easily missed and because the word "advance" is not clear to consumers as a synonym for "loan." In fact, Defendants' own study recommended "advance" as a term which consumers would not associate with "loan." *See* Ex 1. Accordingly, the "Spend more quality time with your refund" advertisement is literally true but misleading.

### b. *"Get your refund ' amount" Val–Pak coupon, in-store posters, and newspaper advertisements*

Defendants' Val–Pak coupon, instore posters, and certain newspaper advertisements are literally true but misleading. First, the Val–Pak coupon advertises "Get your refund amount in as little as 1 day* No additional Charge *When H & R Block Prepares Your Return. Save up to $100.00. ' Call or come in to your nearest H & R Block for details." Ex. 7. The coupon also features H & R Block's "rapid refund" electronic filing mark. Second, an

---

**2.** Plaintiffs' second contention, the advertisement is literally false because "refund" checks are less tax preparation fees, is without merit. In the context of the advertisement, it is implied there is a cost to consumers (*e.g.* "no *extra* cost"), and at least in theory consumers could pay the fee separately from their loan disbursement.

**3.** In addition, Defendants nowhere define in the advertisement the terms "refund amount" or "amount of your refund" in relation to a loan, or for that matter, to any synonym of a loan. Thus, Defendants cannot claim the advertisement literally true but misleading.

advertisement Defendants repeatedly ran in military newspapers uses verbatim the copy appearing on the Val–Pak coupon. *See* Ex. 16 (*The Flagship,* Jan. 27, 2000); Ex. 17 (*The Flagship,* Feb. 10, 2000); Ex. 18 (*The Flagship,* Feb. 24, 2000); Ex. 19 (*The Gator,* Jan. 27, 2000); Ex. 20 (*The Gator,* Feb. 10, 2000); Ex. 21 (*The Gator,* Feb. 24, 2000). Finally, the in-store posters use the same lead language as H & R Block's Val–Pak coupon and the newspaper advertisement. *See* Ex. 23–26 ("Get your refund amount in as little as 2 days. No extra charge.").

Because all of these advertisements use the phrase "Get your refund amount," as opposed to "get your refund," they are not *literally* false. Assuming customers pay for their tax preparation services out of pocket (an option presented to them along with the debiting of their IRS refund), consumers could in fact receive an amount equivalent to their tax refund, *i.e.* a "refund amount." But literal truthfulness does not save these advertisements where they are nonetheless misleading. As an indicator of misleading, the Court considers what the IRS requires of authorized e-file providers. Nowhere does the advertising disclose that the "refund" is actually a loan, notwithstanding IRS procedures requiring clear disclosure in advertising for refund loans. *See* IRS Pub. 1345, § 12(.09), Revenue Procedure 98–50, 1998 WL 638827 ("an Authorized IRS e-file pro-

vider ... must clearly... refer to or describe the funds being advanced as a loan, not a refund; that is, it must be made clear in the advertising that the taxpayer is borrowing against the anticipated refund and not obtaining the refund itself from the financial institution."). The modification of "amount" by "refund" does not convey any idea of a financial obligation. Thus, the Val–Pak coupon, posters, and newspaper ads are literally true but misleading.

### c. H & R Block "Woo Hoo" television commercial

■ Defendants' "Woo Hoo" television commercial[4] is literally true but misleading. The commercial portrays a man receiving a yellow IRS-style envelope in the mail and then bouncing up-and-down on his car, doing flips, swinging around a pole by his feet, etc. The advertisement text features a minuscule superimposed legal disclaimer, "refund anticipation advance subject to qualification, received in two days in most cases." Ex. 27 (videotape of television commercial); Ex. 28 (transcript of commercial). Because of the very small size of the disclaimer, the light color of the text, and the three seconds or less the disclaimer is actually on the screen, particularly when viewed on a television at a reasonable viewing distance, the attempted

---

4. Post trial, Defendants and Plaintiffs have begun disputing the admissibility of Plaintiffs' videotape of H & R Block's "Woo Hoo" commercial. Defendants never raised any foundation or hearsay objection at trial, *see* Tr. 24, and any such objection is now untimely and, in any case, does not affect any substantial right. *See* Fed.R.Evid. 103(a)(1). Other evidence entered later at trial could have established the exhibit's foundation. H & R Block's Director of Media Services, Jenny Lillis, testified both to the time frame for the television commercial as well as the commercial being broadcast in Norfolk. *See* Tr. 626; *see also* Tr. 578 (discussing creation of the television commercial). During trial, Defendants only raised one objection with respect to the videotape and this was with respect to relevancy. *See* Tr. 24 ("Your Honor, we have

no objection to the entry into evidence of this ad.... We ... want to state an objection for the record that the expert opinion offered only dealt with one ad and that is [Exhibit 23], the poster that I showed to the court. So with that understanding of the extent of our objection as to other ads, we have no problem with those ads being looked at by the court."). Defendants argued that because the commercial was not survey-tested for deceptiveness, the commercial was not relevant. *See id.* The Court admitted the videotape subject to Defendants' conditional objection. As the Court explains elsewhere, *see infra* III.B., the commercial was relevant and it was not necessary under the circumstances that the commercial itself have been survey-tested for deceptiveness.

disclaimer is entirely ineffective.[5] The announcer reads "Get a check from us for the amount of your refund in as little as two days with no extra charge." Ex. 28. Similar to the previously discussed advertisement, the television commercial uses the phrase "the amount of your refund," not "refund." Again, although Defendants' advertisement is not literally false, as with the earlier advertisements addressed, the television commercial is misleading in the context. Taken together, the complete advertisement features a man receiving what is apparently, from its yellow color, an IRS refund in the mail. The advertisement then uses the term "amount of your refund" with the representation of getting a refund directly from the IRS, not a loan from a third-party bank. The advertisement conveys the misleading message that consumers will receive their refunds from the IRS within as little as two days. In fact, consumers will receive a loan from Household Bank in one or two days. As a factual issue, the Court finds the advertisement literally true but misleading.

### 3. Non-actionable advertisements

Defendants' radio commercial is not literally false or misleading. The advertisement features an announcer touting the merits of refund anticipation loans. *See* Ex. 29. Because the announcer actually calls the product a "refund anticipation loan," it is not false when taken in the advertisement's entire context. Because the advertisement is not actionable, the Court need not address this advertisement further.

■ Plaintiffs also allege that Defendants' yellow page listing, featuring Defendants' "Rapid Refund" mark, is false advertising. *See* Ex. 30. To the extent that

a "Rapid Refund" mark implicitly refers to refund anticipation loans, it would be false. This implication would occur where Defendants use "Rapid Refund" together with time spans shorter than the standard IRS refund processing period. Whereas refund anticipation loans can be processed in one or two days, the IRS processes refunds in about two weeks. But the yellow page advertisement does not use the short one or two-day loan time frame in conjunction with the mark "Rapid Refund."[6] Accordingly, the "Rapid Refund" mark, as used in the yellow page advertisement, is not false and thus not actionable.

### B. Actually deceive or tendency to deceive

■ If an advertisement is literally false, a court may grant relief without inquiring whether the advertisement actually deceived consumers. *See C.B. Fleet Co.*, 131 F.3d at 434. Where the advertisement is literally true but misleading, a Lanham Act plaintiff must demonstrate the defendant's advertisement actually deceived or else tended to deceive 20% or more of the consuming public. *See Johnson & Johnson–Merck Consumer Pharm. Co.*, 19 F.3d at 129–130, 134 n. 14. In these cases, in addition to anecdotal evidence of actual deception, consumer survey evidence must typically support a plaintiff's claim of a tendency to deceive. *See Johnson & Johnson–Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d. Cir.1992) ("[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey.").

■ Where, however, a plaintiff establishes that a defendant's false advertising campaign was intentional, such as when the false advertising was done maliciously,

---

5. Moreover, the word "advance," as previously addressed, is a synonym for loan infrequently identified as such. Defendants' own internal documents indicate their awareness of consumers' confusion regarding the term. *See* Ex. 1.

6. If the advertisement featured time frames shorter than the IRS can process refunds electronically, but still used the mark "Rapid Refund," then the advertisement would be literally false.

willfully, deliberately, and in bad faith, then the plaintiff need not show actual deception as the court may presume from the defendant's conduct that it in fact actually deceived. *See Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1333 (8th Cir.1997); *Resource Developers, Inc. v. The Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir. 1991). "The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived." *U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir.1986).

■ In this case, Plaintiffs complain of both Defendants' literally false and literally true but misleading advertisements. First, Defendants' literally false advertisement, "Spend more time with your refund" newspaper advertisements without the fine print disclaimer, requires no evidence of actual deception before the Court may grant relief. *See C.B. Fleet Co.*, 131 F.3d at 434. Second, with respect to Defendants' literally true but misleading advertisements (addressed above in §§ III.A.2.a, III.A.2.b, and III.A.2.c), the Act ordinarily requires proof of actual deception or a tendency to deceive. But in this case, Plaintiffs have demonstrated to the Court's satisfaction that the *Porous Media*, *Resource Developers*, and *Jartran* presumption of actual deception, which Defendants have not rebutted, should stand. During trial, Plaintiffs presented evidence establishing that the false advertising campaign was intentional because Defendants acted maliciously, willfully, deliberately, and in bad faith. First, Defendants' advertising campaign targeted its literally false and misleading advertisements at an area of the country where Plaintiffs were launching new franchises. *See* Tr. 574–76; Ex. 99. Defendants were aware of Plaintiffs and their new entry into the market.

That Defendants did not run the offending advertisements in other areas of the state provides convincing evidence supporting an inference of malicious, willful, and deliberate targeting. *Compare* Ex. 23–26 (Hampton Roads market area advertising as "Get your refund amount") *with* Ex. 99 (Richmond area advertising as "Refund anticipation loan"). Second, Defendants' internal report concerning the impact of the word "refund" on consumers establishes absence of mistake. *See* Ex. 1. Together with Defendants' past advertising conduct and prior notice regarding the use of the term "refund," *see, e.g.*, Ex. 2, *In re H & R Block Eastern Tax Services, Inc.*, No. 93–410039 (Fla. Office Attorney Gen. Jan. 6, 1994) (assurance of voluntary compliance); Ex. 3, *Cerullo v. H & R Block, Inc.*, No. 95–409497 (N.Y.Gen.Term) (consent order expiring Dec. 31, 1999); Ex. 4, *In re H & R Block, Inc., No. 93–198* (Conn. Comm'r Consumer Prot. July 27, 1993) (agreement containing consent order to cease and desist), the internal report indicates Defendants' bad faith in repeating such advertising during the 2000 tax season. Third, Defendants made no effort to comply with an IRS e-filing advertisement regulation which required Defendants to "clearly... refer to or describe the funds being advanced as a loan, not a refund; that is, it must be made clear in the advertising that the taxpayer is borrowing against the anticipated refund and not obtaining the refund itself from the financial institution." IRS Pub. 1345, § 12(.09), Revenue Procedure 98–50, 1998 WL 638827. With Defendants' intentional bad faith conduct established, the presumption of deception stands.

■ Alternatively, even without the deception presumption, Plaintiffs have established deception to the Court's satisfaction. Plaintiffs submitted the expert consumer survey evidence of Dr. Myron Glassman to establish that the advertisements tended to deceive.[7] Twenty-two percent of those

---

7. Defendants have attacked the methodology of Plaintiffs' expert witness. Such an attack, however, goes to weight, not admissibility. Dr. Glassman's methodology bears the indicia

surveyed found Defendants' poster advertisement deceptive as failing to state the refund was in reality a loan product. *See* Tr. 99. This degree of deception is substantial. *See, e.g., Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm. Inc.*, 19 F.3d at 129–30, 134 n. 14 (comparing rates of deception in various federal cases). Moreover, the consumer survey evidence addressing the poster applies to the other virtually verbatim advertisements. The in-store posters use the same lead "refund amount" language as H & R Block's Val-Pak coupon and the newspaper advertisement. *Compare* Ex. 23–26 ("Get your refund amount in as little as 2 days. No extra charge.") *with* Ex. 7 ("Get your refund amount in as little as 1 day\* No additional Charge \*When H & R Block Prepares Your Return. Save up to $100.00. Call or come in to your nearest H & R Block for details."). Therefore, Plaintiffs have shown, ·in the alternative, that the survey evidence establishes deception. ·

## C. Materiality

Plaintiffs must establish that Defendants' false advertising was material to consumers, or otherwise put, that the deception was likely to influence a reasonable consumer's purchasing decision. *See U.S. Healthcare, Inc. v. Blue Cross of Greater* .

*Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990). A "[p]laintiff must make some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decision." J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 27:35 (4th ed.1997).

■ Although consumer survey evidence is not required to establish materiality, probative evidence must support a trier of fact's determination of materiality.[8] A court gauges consumer deception, either actual deception or a tendency to deceive, by the consuming public's response to advertisements. Consumer survey evidence typically establishes the element of deception. *See Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d. Cir.1992). In contrast, materiality addresses whether the consumer deception influenced the purchasing decision or not. *See U.S. Healthcare*, 898 F.2d at 922. Not all deceptions in advertising are material. Some deceptions may be so slight that they do not affect the purchasing decision either way, *see, e.g., William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 257 (9th Cir.1995) (deception in advertising letter to pharmacists which warned of three lawsuits, rather than two actual lawsuits, against a competitor's product was not ma-

of reliability for the Court to accord it substantial weight.

8. Defendants rely solely on *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497, 502–3 (5th Cir.2000), for the proposition that proof of the materiality element *requires* survey evidence. *See* Post–Trial Mem. Defs., at 10. The Court declines to adopt Defendants' interpretation of *Pizza Hut*. Deception and materiality are two distinct analyses: (1) whether a false advertisement is *deceptive* (actually or tending to), which analysis requires survey evidence and (2) whether the deception is *material*, which analysis requires probative, but not necessarily survey, evidence. Although the *Pizza Hut* court occasionally in its discussion conflated the proof required for deception and materiality, *see, e.g.*, 227 F.3d at 497 ("The type of evidence needed to prove

*materiality* also varies depending on what type of recovery the plaintiff seeks. Plaintiffs looking to recover monetary damages for false or misleading advertising that is not literally false must prove actual *deception*. Plaintiffs attempting to prove actual *deception* have to produce evidence of actual consumer reaction ... or surveys showing that a substantial number of consumers were actually misled..."), in the end the court only required "probative evidence," not probative *survey* evidence. *Id.* at 503. *See also* J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 27:35 (4th ed. 1997) ("Plaintiff must make some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decision.").

terial because the message conveyed in either case would have been the same); other deceptions may not have been material because the deception came only after the purchasing decision had already been made. *See, e.g., Merck–Medco Managed Care, Inc. v. Rite Aid Corp.,* 22 F.Supp.2d 447, 475 (D.Md.1998) (plaintiff failed to establish materiality of deception where Maryland's decision to rescind a contract was already in motion before its exposure to defendant's false advertisement). The materiality requirement ensures that only those deceptions of any import are actionable.

In this case, Plaintiffs have presented probative evidence supporting a finding of fact that the false advertising statements were material. The nature, quality, and characteristics of a bank–issued NACRAL differ from an actual IRS refund check. Defendants, however, argue that because the NACRAL does not cost consumers any additional money by way of interest or fees, the deception involved in advertising a NACRAL variously as a "refund," "refund amount," or "the amount of your refund" is not material. But Plaintiffs presented probative evidence of several loan features beyond interest and fees which make loan products unattractive. Defendants themselves have noted that the decision to take a loan is much more than a concern about interest. H & R Block conducted a "Rapid Refund Awareness Study" with consumer focus groups in which it determined that loans imply, beyond repayment and interest, "collections and credit ratings." Ex 1, at 7. Evidence adduced at trial and a review of H & R Block's NACRAL form illustrate detrimental aspects of a loan beyond a simple

refund. NACRAL customers were subject to attorneys' fees and collection costs, *see* Ex. 274; Tr. 709; cross-collection from other banks for outstanding obligations,[9] *see* Ex. 274, Tr. 710–11; and customers had to make several certifications, including certifications regarding the discharge of past bankruptcies. *See* Ex. 274, ¶ 7.

In addition to these differences between refunds and loans, Plaintiffs' marketing expert, Dr. Myron Glassman, offered probative causality evidence regarding the effectiveness of substituting the term "refund" with "loan" in advertisement. Some 21.7% of those surveyed indicated that Defendants' "refund amount" advertising would be more effective in impacting consumer purchasing decisions than use of the term "loan" because the service advertised did not appear to be a loan. *See* Ex.253, at 6. The clear inference is that the advertisement would be more effective because of the materiality of the product's denomination as a "loan" or "refund" to consumers. Accordingly, the Court finds that Plaintiffs have established that Defendants' false advertising statements were material to the purchasing decision of consumers because the evidence shows that consumers prefer a refund over any loan product.

### D. "In Commerce"

 Defendants have contended that this Court lacks subject-matter jurisdiction to hear this case. *See* Post–Trial Mem. Defs., at 2–5; Tr. 672–73. However, this Court has subject-matter jurisdiction over Lanham Act false advertising claims by virtue of its federal question jurisdiction. *See* 28 U.S.C. § 1331 (1994). Where a plaintiff asserts a claim under a federal

9. At trial, Victoria Hall, H & R Block Vice President of Business Information and Technology Services, testified that the late decision to launch the NACRAL program resulted in loan forms which did not always apply to NACRAL customers. *See* Tr. 710. Her testimony at trial was that some obligations were waived while others were not. *See* Tr. 708–13. Because she was uncertain as to whether Defendants waived cross-collection from other banking institutions for NACRAL clients,

*see* Tr. 710–11, the Court accepts what evidence it has, Exhibit 274, that cross-collection did in fact still apply to NACRAL customers. According to Victoria Hall's testimony, Defendants waived credit checks for NACRAL customers, *see* Tr. 713, and the $19.99 account cancellation administration fee. *See* Tr. 709; Ex. 274, ¶ 4. However, post–trial the parties have advised the Court that Victoria Hall's testimony at trial was not correct with respect to credit history checks. Defendant's NA-

statute, a federal court has subject-matter jurisdiction to rule upon the complaint unless it is entirely frivolous, even if jurisdiction must eventually be exercised to dismiss the complaint for failure to state a claim. *See Bell v. Hood,* 327 U.S. 678, 681–82, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Plaintiffs' cause of action arises under a federal statute, 15 U.S.C. § 1125(a), which "confers broad jurisdictional powers upon the courts of the United States." *Steele v. Bulova Watch Co.,* 344 U.S. 280, 283–84, 73 S.Ct. 252, 97 L.Ed. 319 (1952). Properly stated, then, Defendants' allegation cannot be that the Court lacks subject-matter jurisdiction. Instead, Defendants can only contend that Plaintiffs have not established an element of liability, the "in commerce" element. To be sure, insufficient evidence in support of the "in commerce" element would defeat Plaintiffs' false advertising claim. But that is not the case here.

 As previously stated, the Lanham Act provides for civil liability against "[a]ny person who uses *in commerce* any false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities of his or her services or commercial activities." 15 U.S.C. § 1125(a) (emphasis added). Defendants,

relying substantially on *Licata and Co. v. Goldberg,* 812 F.Supp. 403 (S.D.N.Y.1993), and cases citing *Licata, see, e.g., Laurel Capital Group, Inc. v. BT Financial Corp.,* 45 F.Supp.2d 469, 478 (W.D.Pa. 1999) (servicemark infringement case), have contended that Congress' use of the term "in commerce" limits the Act's applicability to something less than the full extent of Congress' power under the Commerce Clause, U.S. Const. Art. I, § 8, cl.3. However, neither Defendants' reading of the statute nor the *Licata* court's statement of the law[10] are supported by the Act's text. Congress has provided the definitions applicable to § 1125(a), including the term "commerce." 15 U.S.C. § 1127 (1994).[11] In that section, Congress clearly defined the word "commerce" to encompass *"all commerce which may lawfully be regulated by Congress,"* or otherwise stated, all commerce which Congress can regulate under the full extent of the Commerce Clause. *Id.* (emphasis added).[12] Thus, a plaintiff may bring a false advertising claim with regard to advertising activities that, while intrastate, may have a substantial effect on interstate commerce in the aggregate. *See United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624,

CRAL product did in fact entail credit history checks of H&R Block customers. *See JTH Tax, Inc. v. H&R Block E. Tax Serv., Inc.,* No. 00–51 (E.D.Va. Mar. 28, 2001) (order correcting footnote).

10. In *Licata,* the district court entirely neglected to address 15 U.S.C. § 1127's definition of "commerce" and its effect on the construction of § 1125(a). Accordingly, the Court gives the *Licata* court's interpretation of the phrase "in commerce," and those courts relying principally on *Licata,* no persuasive value. *See also Summit Technology, Inc. v. High–Line Med. Instruments, Co.,* 933 F.Supp. 918, 934 n. 10 (C.D.Cal.1996) (similarly criticizing the *Licata* court for failing to mention, let alone analyze, the Lanham Act's definition of "commerce").

11. To the extent Defendants' counsel knew about this definition of "commerce" (controlling law), counsel were required to bring it to the Court's attention. *See* Virginia Rules of Prof'l Conduct 3.3(a)(3) (2000) ("A lawyer

shall not knowingly ... fail to disclose to the tribunal controlling legal authority in the subject jurisdiction known to the lawyer to be adverse to the position of the client and not disclosed by opposing counsel.").

12. Although the § 1127 definition of "use in commerce" is more narrow than § 1127's definition of "commerce," the "use in commerce" definition *only applies to marks,* be they trademarks, service marks, collective marks, or certification marks, and not false advertising claims. *See* 15 U.S.C.A. § 1127 (West Supp.2000) ("The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."; "The term 'mark' includes any trademark, service mark, collective mark, or certification mark."). Because Plaintiffs' case does not involve any claim of a mark infringement against Defendants, the Court does not offer an analysis of the narrower term "use in commerce" applicable to mark infringement suits, only "commerce," the broader term applicable to false advertising claims.

131 L.Ed.2d 626 (1995); *Wickard v. Filburn,* 317 U.S. 111, 128, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (holding that intrastate production and consumption of homegrown wheat is interstate commerce when taken in the aggregate and that Congress may regulate such activity under the Commerce Clause). Although the Act does not reach purely intrastate activity which the Commerce Clause itself could not reach, the Act's use of "commerce" is nonetheless "at least as broad as the definition of commerce employed in any other federal statute." *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 838 (11th Cir. 1983). In view of the Act's broad definition of "commerce," Defendant's narrow construction of the term "commerce" is entirely unpersuasive.[13]

In this case, Plaintiffs' evidence at trial adequately demonstrated the "in commerce" element of a false advertising claim. Although Plaintiffs' counsel stated at the outset of the case that the interstate commerce element was not at issue, *see* Tr. 9, Plaintiffs did nonetheless adduce credible evidence establishing that Defendants' services and advertisements substantially affected interstate commerce. First, Defendants used the telephone lines and United States mail for both their underlying services and their false or misleading advertisements. For instance, Plaintiffs established that Defendants sent their misleading NACRAL Val–Pak advertisement to customers through the United States mail, *see* Tr. 268, Ex. 7; Defendants transmitted the electronic tax filings to an out-of-state IRS processing center, *see, e.g.,* Tr. 708 (processing center for Tidewater area 5 located in Andover, Massachusetts); Household Bank, a Delaware savings bank, handled Defendants' refund anticipation loans, *see* Ex. 244a; Defendants used misleading NACRAL television advertisements in the Hampton Roads designated market area, *see, e.g.,* Ex. 27, 28; Tr. 24, 532 (the Hampton Roads designated market area encompasses locations outside Virginia, including the Outer Banks and Elizabeth City, North Carolina); and Paula Dill's testimony established that Defendants distributed their NACRAL advertisements to H & R Block offices via Defendants' website. *See* Tr. 606, 609. Second, Defendants conducted their false or misleading advertisements in multiple states nationwide. It is uncontroverted that the NACRAL poster program ran in California, Iowa, New York, Ohio, as well as Virginia. *See* Tr. 540–41. That the states are not contiguous is irrelevant; the NACRAL program substantially affected interstate commerce. Third, both Defendants' NACRAL program, with advertisements in military newspapers, *The Gator* and *The Flagship,* Ex. 14–21, and Plaintiffs' tax preparation services targeted a military clientele hailing from a diversity of states. *See, e.g.,* Tr. 165, 204 (noting large volume of military out-of-state tax preparation). Together, the evidence amply establishes the "in commerce" element to the trier of fact's satisfaction. Accordingly, Defendants' advertisements substantially affected interstate commerce.

 Beyond Defendants' unavailing argument regarding the scope of the "in commerce" element, Defendants allege evidentiary insufficiency. First, it is argued that Plaintiffs' evidence that Defendants used "non-tested" advertisements in interstate commerce, such as exhibits 7–21 and 27–28, cannot satisfy Plaintiffs' burden to show Defendants' store posters, Ex. 26, were also used in interstate commerce. Post–Trial Mem. Defs., at 3 n.3. Essentially, Defendants are claiming that each advertisement must have traveled across state lines to establish an interstate commerce nexus. But the Act does not require that a false or misleading statement itself travel across state lines, only that the

---

**13.** Defendants also apparently found their arguments regarding interstate commerce unpersuasive. In their proposed conclusions of law, Defendants state that their "statements were made in interstate commerce." Defs.' Proposed Findings of Fact and Conclusions of Law, ¶ 69.

service advertised substantially affects interstate commerce. *See Lopez*, 514 U.S. at 558, 115 S.Ct. 1624. Second, it is claimed that any attempt by Plaintiffs to present rebuttal evidence on the interstate commerce requirement would have been improper as not presented during their case-in-chief. *See* Post–Trial Mem. Defs., at 5 n.6. Most of Plaintiffs' rebuttal testimony concerning interstate commerce, however, simply referenced and clarified facts previously established during the course of the trial. In fact, most of the above noted evidence comes from Plaintiffs' case-in-chief. Plaintiffs have established the "in commerce" element.

### E. Injury

Under 15 U.S.C. § 1125(a)(1), violators of the Act are liable in a civil action to "any person who believes that he or she is or is likely to be damaged by such act." Because an analysis of actual and future injury relates closely to the analysis of remedies, the Court treats both together to avoid repetition. Below the Court examines by category of damages whether and, where relevant, how much of Plaintiffs' injury is attributable to Defendants.

### 1. Defendants' profits

■ Pursuant to 15 U.S.C. § 1117(a), "[a]n award to the plaintiff of the defendant's profits, even if plaintiff's actual sustained losses may have been less, is appropriate under theories of unjust enrichment or deterrence." *Black & Decker, Inc.*, 26 F.Supp.2d at 855. An award of a defendant's profits requires proof that the de-

fendant acted willfully or in bad faith. *See Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 641 (D.C.Cir.1982). Where an award is appropriate, the animating principle behind a grant of defendants' profits is that the award "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

■ As a threshold analysis for the award of Defendants' profits, the Court finds that Defendants acted willfully and in bad faith. The false or misleading advertisements targeted Plaintiffs during a roll-out year and in the area of the roll-out. At trial, Plaintiffs demonstrated that in regionally close areas where Plaintiffs were *not* present, including Richmond and Roanoke, Defendants used the word "loan" rather than "refund" in their ads. *See* Tr. 574–76; *compare* Ex. 23–26 ("Get your refund amount") *with* Ex. 99 ("Refund anticipation loan"). This evidence supports an inference of malicious, deliberate, and willful targeting. Defendants have had previous notice regarding their misuse of the term "refund" and their failure to use the term "loan." While Defendants have repeatedly argued that the previous litigation involved state statutes (and was thus not relevant), *see* Tr. 36, it is clear to the Court that Defendants' conduct also violated IRS *federal* advertising requirements. *See* Ex. 65, IRS Pub. 1345, § 12(.09).[14]

Defendants claim that the NACRAL program and advertising campaign actually cost Defendants profits and, ergo, they could not have profited from the false advertising. *See* Post–Trial Mem. Defs., at 18. While this might be true in the short

---

**14.** Section 12, Advertising Standards for Authorized IRS *e-file* Providers and Financial Institutions, provides in relevant part:

.01 An Authorized IRS e-file Provider must comply with the advertising and solicitation provisions of 31 C.F.R. Part 10 (Treasury Department Circular No. 230). This circular prohibits the use or participation in the use of any form of public communication containing a false, fraudulent, misleading, deceptive, unduly influencing, coercive, or unfair statement or claim. Any claims concerning faster refunds by

virtue of electronic filing must be consistent with the language in official Service publications.

.02 *An Authorized IRS e-file Provider must adhere to all relevant federal, state, and local consumer protection laws that relate to advertising and soliciting ....*

.04 An Authorized IRS e-file Provider must not use improper or misleading advertising in relation to the Form 1040 IRS e-file Program (including the time frames for refunds and RALs)....

(emphasis added).

run with respect to anticipated profits, evidence at trial suggested that, to the contrary, this advertisement campaign was not a failure. Through the NACRAL advertising, Defendants increased by 24.8% the number of returns they processed in Tidewater during the 2000 tax season, compared with a 0.8% increase in non-NACRAL areas. *See* Ex. 254, Tab 2. As a result, Defendants simultaneously increased their opportunity to cross-market their mortgage and financial services to customers. *See, e.g.,* Tr. 716–17; Ex. 24, 37, 254, at 2 ("nearly 43% of H & R Block's company-served tax clients indicated an interest in additional services with 225,000 tax clients referred for investment services and approximately 1.6 million tax clients referred to Block's mortgage services"). While experiencing a short-term loss relative to the previous year, Defendants increased their future client base for repeat tax preparation business, *see, e.g.,* Tr. 594, and increased the exposure for their year-round mortgage and financial services.

Alternatively, Defendants argue that Plaintiffs cannot receive Defendants' profits because Defendants neglected to report NACRAL and RAL profits separately and Defendants cannot distinguish the two categories of profits in order to quantify an award. *See* Ex. 256, at 1. Equitable considerations will not permit Defendants' accounting omission to deny Plaintiffs any relief. *See ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 969 (D.C.Cir.1990) ("the wrongdoer shall bear the risk of the uncertainty which his own wrong has created") (quoting *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). The Court, however, is constrained by the text of the Act. Any award to Plaintiffs for Defendants' false advertising must be compensatory, not punitive. *See* 15 U.S.C. § 1117(a). Accordingly, the Court will not award Plaintiffs all, or even most, of Defendants' profits.[15]

There is a basis in the record for some award of profits. As previously stated, Defendants' increase in non-NACRAL Virginia areas was 0.8%. In the Hampton Roads/Tidewater area where the false advertisements ran in tandem with the NACRAL program, Defendants increased the number of returns prepared by 24.8%, 24% more than Defendants' percentage increase of 0.8% during the 2000 tax season in non-NACRAL areas in Virginia.[16] But in the absence of the false advertising, not all of the 24% increase in volume would have necessarily gone to Plaintiffs. During trial, Defendants brought out the sizeable presence of another major industry competitor, Jackson Hewitt. *See* Tr. 483 (approximately 70 Jackson Hewitt offices in Hampton Roads). In a market unsullied with false advertising, non-parties, such as Jackson Hewitt, would also have won some of the tax preparation business. If Jackson Hewitt (excluding all other injured parties as unsupported by Defendants' evidence) also successfully sued Defendants for Lanham Act violations, then any award against Defendants exceeding Plaintiffs' market share would constitute a punishment rather than compensation. Expert witness Walter Stosch determined that Defendants received 9,446 returns as a result of its false advertising. Mr. Stosch already accounted for Defendants' increase in the absence of false advertising

---

**15.** In addition, Plaintiffs have asked the Court to award them treble damages under 15 U.S.C. § 1117(b). The provisions for trebled damages, however, only apply to violations of 15 U.S.C. § 1114(1)(a), not § 1125(a). Accordingly, the Court declines to award treble damages to Plaintiffs.

**16.** Defendants argue that the increase in returns in this market was due to the competitive pricing of its NACRAL program rather than its false advertising campaign for the NACRAL program. In opposition, Plaintiffs presented evidence of their competitive efforts at price-cutting, at times even offering free returns. *See, e.g.,* Ex. 116, 142, 145, 171, 179, 184, 192. The record supports the finding that the increase in returns relates primarily to Defendants' false advertising rather than Defendants' attempt to bundle the costs of the underlying services.

as 0.8%. Without Defendants' false advertising, *ceteris paribus,* the 24% increase, or 9,446 returns, would have been divided among the relevant competitors, Jackson Hewitt and Liberty Tax, with approximately 70 and 25 offices, respectively. *See* Tr. 483–84. Furthermore, not all 25 Liberty Tax Service offices belonged to plaintiff franchise owners; Plaintiffs only operated 19 offices, and of these 19 offices, only 17 offices were fully operational during the whole tax season.[17] In its equitable discretion, the Court determines Plaintiffs' market share, by reference to its offices, to be approximately 18%. Eighteen percent of the 9,446 returns calculated by Mr. Stosch would equal 1,700 returns at an average fee per client of $83.22,[18] or a total of $141,474. Defendants' percentage of company-served tax clients indicating an interest in additional H & R Block financial services is 43%. The Court uses this figure as an equitable proxy for the percentage of clients actually retained for future business. Because the average retention of a client is six years, *see* Ex. 254, Tab 2, some 731 clients are return business denied to Plaintiffs. Over six years, the total profits for these 731 retained clients would equal $365,003 above and beyond the $141,474 in profits during the 2000 tax season. Accordingly, the Court **GRANTS** to Plaintiffs an award of $506,477 from Defendants' profits. Defendants shall be jointly-and-severally liable.

## 2. Damages sustained by Plaintiffs

The Act provides that a plaintiff prevailing under § 1125(a) may recover "defendant's profits, any damages sustained by the plaintiff, and the costs of the action." 15 U.S.C.A. 1117(a) (West Supp.2000). A

plaintiff's losses may include profits lost on sales made at prices reduced as a demonstrated result of the false advertising, *see Burndy Corp. v. Teledyne Indus.,* 748 F.2d 767, 773 (2d Cir.1984); sales actually diverted to the false advertiser, *see ALPO Petfoods, Inc.,* 913 F.2d at 969; the costs of any completed advertising that actually and reasonably responds to the defendant's offending ads, *see Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.,* 580 F.Supp. 634, 640–41 (S.D.N.Y.1984); and quantifiable harm to the plaintiff's good will, *see Engineered Mech. Servs., Inc. v. Applied Mech. Tech., Inc.,* 591 F.Supp. 962, 966 (M.D.La. 1984).

### a. Reduced price sales

Because Plaintiffs first entered the Hampton Roads income tax preparation marketplace during the 2000 tax season, the Court lacks a benchmark to quantify the money losses Plaintiffs experienced through reduced price sales due to Defendants' false advertising. Although Plaintiffs established at considerable length their professional qualifications in the tax preparation industry, *see, e.g.,* Tr. 76–77, 189, it is difficult to ascertain how effective Plaintiffs' Send a Friend referral system, discount coupon, candy jar and balloon marketing campaigns, *see,* Tr. 59, 169–70, would have been in the absence of H & R Block's false advertising without some past performance as a benchmark. Plaintiffs rely on evidence that their actual profit was less than forecast. Plaintiffs established at great length their projected budgets for discounts and projected profits. *See, e.g.,* Tr. 337, 340 (Plaintiff Richard Simon offered "wider and deeper dis-

---

**17.** Plaintiffs Sherazi and Ponte each had an office which confronted special circumstances preventing full operation. Plaintiff Sherazi was forced to close his Norfolk store in the middle of the tax season due to a robbery and the theft of all his equipment. *See* Tr. 250. Plaintiff Ponte closed her second office only three weeks after opening due to insufficient consumers. *See* Tr. 214, 224. Her business from that office, 37 clients, was negligible, *see* Tr. 224, and accordingly the Court does not

count the office in its equitable assessment of Plaintiffs' market share.

**18.** The Court uses Mr. Stosch's expert witness testimony on behalf of Plaintiffs to determine the average fee per client of $83.22. This figure actually represents less per client than Defendants' expert witness calculated. *See* Ex. 264.

counts" but not more than he budgeted prior to the start of Defendants' false advertising campaign). This evidence, however, only establishes that hope runs perennial and that a start-up business is more likely to project more, rather than less, profit. This is not to say that new entrants to product or service markets must be prey to an incumbent's false advertising during 'a new entrant' safe harbor. Plaintiffs could have employed evidence of comparable markets as a proxy for their losses. Plaintiffs did not provide evidence of comparable markets where both Defendants and other JTH Tax franchises competed in the absence of false advertising. Where there is no such market, Plaintiffs could have presented evidence of how a proxy competitor fared in the absence of false advertising. Accordingly, the Court denied recovery of damages for reduced price sales.

### b. Diverted sales

Plaintiffs have presented anecdotal evidence supporting some diversion of their sales to Defendants.[19] Indeed, the false advertising in Defendants' window posters, coupled with the very close proximity of Defendants' locations to Plaintiffs' franchisees, strongly supports an inference of diversion.[20] This diversion testimony, however, does not establish what quantum of harm Plaintiffs suffered from diversion of sales. In the absence of a benchmark for typical tax service sales, Plaintiffs have not established by a preponderance of the evidence what quantum of loss they sustained and what amount was attributable to Defendants.[21] Accordingly, the Court does not award Plaintiffs recovery for diverted sales.[22]

### c. Responsive advertising

Plaintiffs failed to establish the cost of responsive advertising as a loss. In the first place, the $80,000 estimate represented advertisement expense for *all* JTH Tax franchisees in Hampton Roads and not just franchisee Plaintiffs. Second, there was no indication at trial that this advertisement was corrective. In fact, it appeared that Plaintiffs committed to this advertisement *before* the H & R Block Defendants began their false advertising campaign. Although Plaintiffs claimed that the advertisement was corrective for

19. The eyewitness testimony of Plaintiff Dennis Stuver established that at least one consumer did in fact leave his franchise and directly enter one of Defendants' offices. *See* Tr. 446.

20. Plaintiffs Dan Lepkowski, Charles Dawson, Kathleen Ponte, Jama Corleto Marcil, Syed Sherazi, Vincent Jackson, Richard Simon, John Seal, and Dennis Stuver all testified to the close physical proximity, often between 200 feet to a mile, of Defendants' offices to Plaintiffs' franchises. *See, e.g.,* Tr. 52 (Plaintiff's franchise was 300 feet from one of Defendants' offices).

21. At least some diversion of business from Liberty Tax to H & R Block may have been attributable to Plaintiffs themselves. Defendants presented evidence at trial establishing that most Plaintiffs suffered from technical difficulties inherent with the launch of a new business, in particular, the malfunctioning of the Universal Tax Systems ("UTS") loan processing system and the remedial transfer to the Nelco System. *See, e.g.,* Tr. 61–62, 66–68, 262–66, 275–76; Ex. 164, 216–18, 220, 221, 226. Because IRS e-filing only opened on January 14, 2000, and because Plaintiff JTH Tax signed the Nelco mitigation contract by January 24, 2000, Defendants overstated the effect of this temporary, early failure. Evidence at trial established that the peak tax season occurred only by early February. *See* Tr. 365–66, 408–409. Nonetheless, the system failure doubtlessly would have diverted some amount of business. *See, e.g.,* Tr. 431–33 (inability to offer RALs during this time).

22. The Court notes that the calculation of Plaintiffs' damages with respect to diverted sales and Defendants' profits may at times be two sides of the same coin. Here, the primary difference between these two calculations, as well as the Court's granting of Defendants' profits but not Plaintiffs' damages, is the source of the data. Plaintiffs' diverted sales damages would relate to data available from Plaintiffs, *i.e.* damages measured with respect to a benchmark from past sales data (in this case, unavailable). A calculation of Defendants' profits, however, does not require past sales performance data from Plaintiffs.

tax season 2001, the court finds little support in *ALPO Petfoods* for such an award of advertising costs. *See* 913 F.2d at 969. In that case, the court permitted the cost of advertisement as part of plaintiff's losses only where the plaintiff had already undertook responsive advertising. *See id.* at 969. Accordingly, the Court does not award Plaintiffs their advertising costs.

### d. Business good will

Plaintiffs did not argue or establish any harm to their business good will. Defendants' advertisements did not impugn Plaintiffs' reputation. Indeed, with a first time entry into the marketplace, there was little established good will to be damaged.

### 3. Costs of the action

■ Prevailing plaintiffs recover costs. *See* 15 U.S.C. § 1117(a). These costs may include expert witnesses, paralegals, case assistants, law clerks, secretarial overtime, travel expenses, and long distance telephone calls. "Costs" include any other cost that an attorney would typically bill separately. *See* Dan B. Dobbs, *Awarding Attorney Fees Against Adversaries: Introducing the Problem,* 1986 Duke L.J. 435, 481 (1986).

In this case, Plaintiffs have prevailed in establishing Defendants' liability for false advertising. Accordingly, the Court **ORDERS** Plaintiffs to submit a statement of their costs to the Court for a determination of their actual total judgment. Defendants shall be jointly-and-severally liable for Plaintiffs' costs as approved by the Court.

### 4. Reasonable attorneys' fees

■ In general, the American rule does not allow a prevailing litigant to recover attorneys' fees from the losing litigant. The Act, however, has abrogated this rule with a statutory exception permitting the award of reasonable attorneys' fees to the prevailing party in "exceptional" instances. 15 U.S.C. § 1117(a). This award of attorneys' fees applies both to trademark infringement actions as well as false advertising claims. *See* 15 U.S.C. § 1117(a) ("When ... a violation under § 1125(a) ... shall have been established ... the plaintiff shall be entitled ... to recover [damages].... The court in exceptional cases may award reasonable attorney fees to the prevailing party."); *see, e.g., Neva, Inc. v. Christian Duplications Intern., Inc.,* 743 F.Supp. 1533 (M.D.Fla. 1990) (awarding attorneys' fees in Lanham Act false advertising case). Whether a case is "exceptional" depends on whether the losing party's conduct was variously "malicious," "fraudulent," "deliberate," and "willful" in its false advertising. *Scotch Whisky Ass'n v. Majestic Distilling Co.,* 958 F.2d 594, 600 (4th Cir.1992) (providing the standard in the Lanham Act's mark infringement context).

Plaintiffs are the prevailing party in this suit and under 15 U.S.C. § 1117(a), Defendants' conduct entitles Plaintiffs to an award of counsel fees. As previously stated, Defendants'. false advertising was malicious, deliberate, and willful. The Court concludes, therefore, that Defendants' conduct merits an award of attorneys' fees. Because Plaintiffs could have retained outside counsel to litigate this case, Defendants will pay attorneys' fees for Plaintiffs' in-house counsel, Mr. Khalil, as well as the outside counsel. Accordingly, the Court **ORDERS** Plaintiffs to submit a statement of their attorneys' fees to the Court for the determination of their actual total judgment. Defendants shall be jointly-and-severally liable for Plaintiffs' costs as approved by the Court.

### 5. Equitable relief

#### a. Irreparable harm

■ A plaintiff who seeks to obtain an injunction must show that it will suffer irreparable harm if the court does not grant the injunction. *See Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir.1996). Because it is "virtually impossible to prove that so much of one's sales

will be lost as a direct result of a competitor's advertisement," a demonstration that the competitor's advertising tends to mislead consumers satisfies the Act's irreparable harm requirement. *Black & Decker, Inc.*, 26 F.Supp.2d at 862 (quoting *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316–17 (2d Cir.1982)). Where a plaintiff is a direct competitor with a defendant, market studies which indicate the advertisement tended to mislead provide "the causative link between the advertising and the plaintiff's potential lost sales, and thereby indicate[ ] a likelihood of injury." *Coca–Cola Co.*, 690 F.2d at 316–17; see also *United Indus. Corp.*, 140 F.3d at 1183 ("When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfied the requisite showing of irreparable harm."); *Burndy Corp.*, 748 F.2d at 772 (permanent injunctive relief granted upon proof of the likelihood that purchasers of the product may be misled by the false advertising). This consumer survey evidence is the very same survey evidence establishing that a defendant's literally true but misleading advertisement actually deceived or tended to deceive. In this case, Plaintiffs seek permanent nationwide injunctive relief against Defendants' literally false and literally true but misleading advertisements. Plaintiffs have already established the likelihood of irreparable harm with their consumer survey evidence that Defendants used misleading advertisements which tended to deceive. *See supra* III.B. Accordingly, Plaintiffs have established irreparable harm justifying injunctive relief.

In ascertaining the geographic scope of the injunction, the Court notes Defendants' regional and national conduct. Defendants are a national enterprise and its incorporated regional division, and they have litigated several substantially similar lawsuits across the country. When they have consented to one state's court order,

they have simply taken their advertisements to a new jurisdiction and continued to run similarly offending advertisements. *See, e.g.*, Ex. 2, *In re H & R Block Eastern Tax Services, Inc.*, No. 93–410039 (Fla. Office Attorney Gen. Jan. 6, 1994) (assurance of voluntary compliance); Ex. 3, *Cerullo v. H & R Block, Inc.*, No. 95–409497 (N.Y. Gen. Term) (consent order expiring Dec. 31, 1999); Ex. 4, *In re H & R Block, Inc., No. 93–198* (Conn. Comm'r Consumer Prot. July 27, 1993) (agreement containing a consent order to cease and desist). This conduct, together with Defendants' similar advertisements in several other states, counsels that the scope of injunctive relief be nationwide.

Defendants argue that the Consent Order signed February 17, 2000 (filed February 18, 2000) obviates the need for the Court's award of injunctive relief. *See* Damages Recoverable Mem., at 7. However, notwithstanding the Consent Order's narrow scope, Defendants continued to run both misleading and false advertisements even after the Court entered the parties' consented order. Specifically, Defendants continued to run an offending newspaper advertisement even after the Order. The Consent Order obligated Defendant H & R Block Eastern Tax Services to discontinue using newspaper advertisements representing RALs as a product generating a "refund amount," or an "amount of your refund" at no extra charge or cost, or a product which allows the customer to "Spend more quality time with your refund." Consent Order, at 1–2. Plaintiffs presented evidence that Defendants ran at least two advertisements in violation of the Consent Order on February 24, 2000, one week after the Court signed the Consent Order. *See* Ex. 15 (*The Gator*, Feb. 24, 2000) ("Spend more quality time with your refund"); Ex. 21 (*The Gator*, Feb. 24, 2000) ("Get your refund amount in as little as 1 day").[23] Defendants' conduct merits

---

**23.** Although the Consent Order provided that it would "not apply to any advertising, promotion, or the use of any coupons for mail

distribution for which delivery cannot be stopped through reasonable efforts," the Court finds six or seven days provided Defen-

injunctive relief. Moreover, Defendant H & R Block's press release suggested the strong possibility of future similar conduct if it resulted in a large increase in client volume. *See* Ex. 35 ("If the trial proves successful in retaining clients and attracting new ones, H & R Block will consider expanding the program to additional markets next year."). Here, an injunction would reinforce the IRS authorized e-filer requirement, which Defendants have to this point violated. These factors strongly counsel permanent and broader relief than the Consent Order conferred.

*b. Equitable considerations*

■ Defendants, however, allege that Plaintiffs have acted inequitably with "unclean hands" and therefore may not receive equitable relief. The Act provides that courts shall have power to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable . . ." 15 U.S.C.A. § 1116(a) (West Supp.2000). Similarly, § 1117(a) provides that a plaintiff may recover profits, damages and costs "subject to the principles of equity." (West Supp. 2000). The unclean hands defense is such an equitable principle. The maxim against unclean hands provides that "he who comes into equity must come with clean hands." *Mas v. Coca–Cola Co.*, 163 F.2d 505, 509 (4th Cir.1947) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 813, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)).

■ The party asserting an unclean hands defense carries the burden of establishing each of the elements of this affirmative defense. *See* Fed.R.Civ.P. 8(c) ("[A] party shall set forth affirmatively . . . estoppel . . . laches . . . and any other matter constituting an . . . affirmative defense.") (listing several defenses that were traditionally equitable defenses); *Pierce v. Apple Valley, Inc.*, 597 F.Supp. 1480, 1485

(S.D.Ohio 1984) (stating unclean hands is an affirmative defense). To establish the affirmative defense of unclean hands, a defendant must demonstrate (1) the plaintiff's conduct was in fact inequitable, *see Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir.1997); (2) plaintiff's conduct directly related to the claim which it has asserted against the defendant, *see Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ("While equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.") (citations omitted); *see, e.g., Haagen–Dazs, Inc. v. Frusen Gladje, Ltd.*, 493 F.Supp. 73, 76 (S.D.N.Y.1980) (barring plaintiff from obtaining injunction against defendant's false designation of its ice cream as Scandinavian when plaintiff's own labeling falsely suggested that its ice cream was from Sweden); and (3) plaintiff's conduct injured the defendant. *See Lawler v. Gilliam*, 569 F.2d 1283, 1293 n. 7 (4th Cir.1978) ("The party to a suit, complaining that his opponent is in court with 'unclean hands' because of the latter's conduct in the transaction out of which the litigations arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case.") (quoting J. Pomeroy, A Treatise on Equity Jurisprudence § 399).

■ In this case, Defendants allege Plaintiffs engaged in conduct on four occasions that rendered their hands unclean under equitable principles. First, Defendants claim that Plaintiffs used advertising language, "Fastest refund loans," that went "beyond mere puffery." Post–Trial Mem. Defs., at 19. "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory lan-

dants ample time to comply, through reasonable efforts, with the voluntarily entered Consent Order.

guage." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir.1993). Such puffery is not deceptive, and thus not actionable under § 1125(a). *See, e.g., Cook, Perkiss and Liehe, Inc. v. N.Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir.1990) (agreeing with district court that advertisements regarding lower cost and superiority were puffery and thus nonactionable). By contrast, when advertisement more than generally touts a product's attributes, but references testing of measurable qualities, for instance, by comparative research, the advertisement is not merely puffing. *See Castrol*, 987 F.2d at 945 (finding advertisement is not puffery but literally false where firm substantiated its claims of superiority by reference to specific, but false and incomplete, tests); *Syncsort, Inc. v. Sequential Software*, 50 F.Supp.2d 318, 342 (D.N.J.1999) (going beyond puffery with advertisements which, when citing comparative tests, assert product is "fastest").

█ Here, while speed is a measurable quantity, Plaintiffs' assertions are general and Defendants did not even allege that Plaintiffs made any reference in advertisement to comparative testing which falsely established their product as 'fastest.' In 1994, this Court addressed similar puffery in an advertisement run by Defendant H & R Block, Inc. *See Jackson Hewitt, Inc. v. H & R Block, Inc.*, No. 94–106 (E.D.Va. Jan. 31, 1994) (Norfolk Division) (hearing and order denying plaintiff's motions for temporary restraining order and preliminary injunction). In that case, the Court ruled that H & R Block's use of "Nothing's Faster, Nothing's Easier" amounted to mere puffery and was accordingly nonactionable. *See id.* In this case, Defendants, somewhat ironically, now ask the Court to find that Plaintiffs' use of the phrase "Fastest Refund Loans" goes beyond mere puffery. *See* Post–Trial Mem. Defs., at 19; Ex. 192. The Court declines Defendants' invitation and decides this issue similarly. Although "faster" and "fastest" typically mean different things, the one comparative and the other superlative, the Court points out to Defendants that the phrase "Nothing's faster" conveys the equivalent message of "fastest." In the 1994 case, "Nothing's Faster" implicitly compared H & R Block's product to all competitor products. The statement expressed the comparison that no competing product ("nothing") was faster, or in other words, H & R Block's product was "fastest." If "Nothing's Faster" is mere puffery, "fastest" without more is also nonactionable exaggerated sales-talk. Therefore, Plaintiffs' "Fastest Refund Loans" language is puffery, not false advertising, and Plaintiff's hands cannot be unclean because of it.

█ Second, Defendants allege that Mr. Frank Grim, a non-plaintiff Liberty Tax franchisee, employed an outdoor sign during the 2000 tax season advertising a refund anticipation loan as a "refund." During trial, it was indeed established to the Court's satisfaction that this franchisee did use such an advertisement. *See* Ex. 32. The Court finds, however, that Mr. Grim's conduct is not an appropriate equitable consideration. While Mr. Grim's conduct was likely not equitable, he is simply not a plaintiff, something an unclean hands defense ordinarily presupposes. Aware of Mr. Grim's status, Defendants made much of the fact that his franchisor, JTH Tax, is a plaintiff in this case. *See* Post–Trial Mem. Defs., at 19–20. But to establish Plaintiff JTH's franchisor liability for a non-party franchisee's conduct, Defendants needed to demonstrate an agency relationship between franchisor and franchisee, *see Hayward v. Holiday Inns, Inc.*, 459 F.Supp. 634, 635 (E.D.Va.1978), a relationship Defendants entirely neglected to prove. At trial Defendants introduced literally no evidence demonstrating any agency relationship between Plaintiff JTH Tax and the non-plaintiff franchisee: no franchise agreement, no operating manuals, nothing es-

tablishing an agency relationship.[24] In contrast, Plaintiffs established at trial that when Plaintiff JTH Tax discovered Mr. Grim's use of the outdoor sign, Plaintiff JTH Tax did not condone the advertisement. *See* Tr. 457, 812–13. Without any evidence to support any agency relationship, Defendants have not established any franchisor liability for the non-party franchisee, and Plaintiff JTH Tax's hands are therefore clean.

Third, Defendants allege that Plaintiffs used the word "refund" in their in-store manuals and publications to describe their refund anticipation loan products. To establish unclean hands, Defendants must first show that Plaintiffs' alleged conduct was inequitable. *See Levi Strauss & Co.*, 121 F.3d at 1313. To this end, Defendants claim that Plaintiffs' Customer Product Sheet uses the word "refund" to describe a refund anticipation loan. *See* Ex. 243; Post–Trial Mem. Defs., at 20. The Court finds, however, that Defendants have merely excised the word "refund" from its immediately surrounding context. On the Customer Product Sheet, the word "refund" is used in a column heading labeled "time to receive refund." Three of the four rows of products below are in fact refunds directly from the IRS. The one loan product is prominently described as a "refund anticipation loan," which states in bold-print "loan," and in bold set-off print states: "A RAL is a loan. There is always the possibility that you may be declined BY THE BANK issuing the loan...." Ex. 243. This use of a bold-print disclaimer contrasts with Defendants' use of "refund" on its advertisements where at no point is the product described as a loan, only as a "refund" or, in barely legible fine print, an

"advance." The Court finds that Defendants' characterization of exhibit 243 is unavailing and borders on frivolousness. Accordingly, the Court finds that Defendants' contentions are without merit and that Plaintiffs' hands are clean.

Fourth, Defendants move the Court (twice) to supplement the record and allege (1) that a non-plaintiff Liberty Tax franchisee in Harrisburg, Pennsylvania, infringed its trademark "Rapid Refund" and (2) that a non-plaintiff Liberty Tax franchisee in Atlanta, Georgia, engaged in misleading advertising. *See* Defs.' Mot. Supplement R.; Defs.' Second Mot. Supplement R.[25] As with Defendants' second claim of unclean hands, the immediate conduct at issue is not that of any of the Plaintiffs. Neither during trial nor in their motions to supplement the record have Defendants demonstrated that the franchisor, Plaintiff JTH Tax, was the party allegedly infringing Defendants' trademark or falsely advertising. Moreover, although Defendants carry the burden of establishing affirmative defenses such as unclean hands, as with Defendants' second claim of unclean hands, Defendants have done nothing in the alternative to establish an agency relationship between these non-party franchisees and franchisor Plaintiff JTH Tax. Furthermore, the Court notes that Defendants' claim of trademark infringement against a non-plaintiff Liberty Tax Service franchisee from Harrisburg, Pennsylvania, is not related to the subject matter of this case, a false advertisement claim by different parties in a different region of the country. Finally, Defendants have not established that the alleged conduct harmed them, *see Lawler*, 569 F.2d at 1293 n. 7, particularly

**24.** Plaintiff JTH Tax's franchise agreements appear to be a standard form. *See, e.g.,* Ex. 100. Even if Defendants' had submitted Mr. Grim's franchise agreement in an effort to establish agency, it is unlikely, without more, that Defendants would prevail. The standard agreement provides that franchisees are *not* the franchisor's agent and that the franchisor will not be liable for acts of franchisees. *See* Ex. 100, at 14, ¶ 11. Defendants did not produce additional evidence establishing any agency relationship contrary to the form agreement's terms.

**25.** Plaintiffs similarly moved to supplement the record with additional evidence of Defendants' false advertising. *See* Pls.' Mot. Supplement R. The evidence is cumulative and unnecessary to the Court's analysis.

in view that their "Rapid Refund" trademark, to the extent that phrase refers to refund anticipation loans, may be entirely unenforceable as false advertisement. *See, e.g., Clinton E. Worden & Co. v. Cal. Fig Syrup Co.*, 187 U.S. 516, 534, 23 S.Ct. 161, 47 L.Ed. 282 (1903) ("[I]f it appears that the trademark for which he seeks protection is itself a misrepresentation to the public and has acquired a value with the public by fraudulent misrepresentation in advertisements, all relief will be denied to him."). For these reasons, the Court **DENIES** Defendants' and Plaintiffs' motions to supplement the record and finds that Defendants have failed to establish that Plaintiffs have unclean hands.

Accordingly, having found no equitable consideration to bar the relief Plaintiffs have requested, the Court will tailor a narrow remedial injunction to address Defendants' advertising practices.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** judgment to Plaintiffs.

### A. Monetary Relief

The Court **GRANTS** Plaintiffs $506,477 of Defendants' profits as well as Plaintiffs' reasonable attorneys' fees and the costs of this action. The Court **ORDERS** Plaintiffs to submit a memorandum detailing their attorneys' fees and costs by Monday, March 26, 2001.

The Court **DENIES** recovery of Plaintiffs' damages.

### B. Injunctive Relief

The Court grants Plaintiffs the following injunctive relief:

It is hereby **ORDERED** that, in all market areas of the United States and by close of business Friday, March 9, 2001, Defendants and their agents, employees, and all other persons and entities in active concert or participation with them shall not:

(1) advertise in violation of IRS Publication 1345, § 12(.09) of Revenue Procedure 98–50, 1998 WL 638827 by representing any loan product, whether or not fees or interest are charged, as a "refund." In all advertisements, Defendants shall comply with the IRS requirement to disclose whether any product is a loan. "Advance" shall be non-complying language. The disclosure shall appear clearly and prominently in print advertisements and shall be clearly stated in broadcast advertisements;

(2) refer to a loan product disbursement, whether or not fees or interest are charged, as an "advance," "refund amount," a check in the "amount of your refund," unless prominently and clearly stated in the advertisement as a "loan."

(3) use the term or mark "rapid refund" in connection with loan products, whether or not fees or interest are charged.

### C. Other Relief

It is further **ORDERED** that Defendants' Motion to Supplement the Record, Plaintiffs' Motion to Supplement the Record, and Defendants' Second Motion to Supplement the Record are **DENIED**.

The Court **DIRECTS** the Clerk of the Court to send copies of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED.**