**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JTH TAX, INCORPORATED; THOMAS
BENNETT; JAMA CORLETO; CHARLES
DAWSON; LANDSTOWN PRESCHOOL,
INCORPORATED; JAMES FORGUSON;
ANN MARIE FORGUSON; A&J TAX
SERVICE; ANNETTE HOBBS; DONNIE
HOBBS; DANDA, INCORPORATED;
VINCENT JACKSON; DANIEL
LEPKOWSKI; FREEDOM TAX,
INCORPORATED; CHARLES LOVELACE;
CREATIVE MANAGEMENT SYSTEMS,
INCORPORATED; KATHLEEN PONTE;
JOHN SEAL; MARCIA SEAL; JMS TAX,
INCORPORATED; SYED SHERAZI; B&L
INVESTMENT, INCORPORATED; RICHARD
SIMON; DENNIS STUVER; DCM & B,
LLC, d/b/a Liberty Tax Service,
    *Plaintiffs-Appellees,*

   v.

H & R BLOCK EASTERN TAX
SERVICES, INCORPORATED; H&R
BLOCK TAX SERVICES, INCORPORATED,
    *Defendants-Appellants.*

FRANK GRIM,
      *Movant.*

No. 01-1353

JTH TAX, INCORPORATED; THOMAS
BENNETT; JAMA CORLETO; CHARLES
DAWSON; LANDSTOWN PRESCHOOL,
INCORPORATED; JAMES FORGUSON;
ANN MARIE FORGUSON; A&J TAX
SERVICE; ANNETTE HOBBS; DONNIE
HOBBS; DANDA, INCORPORATED;
VINCENT JACKSON; DANIEL
LEPKOWSKI; FREEDOM TAX,
INCORPORATED; CHARLES LOVELACE;
CREATIVE MANAGEMENT SYSTEMS,
INCORPORATED; KATHLEEN PONTE;
JOHN SEAL; MARCIA SEAL; JMS TAX,               No. 01-1843
INCORPORATED; SYED SHERAZI; B&L
INVESTMENT, INCORPORATED; RICHARD
SIMON; DENNIS STUVER; DCM & B,
LLC, d/b/a Liberty Tax Service,
                    *Plaintiffs-Appellees,*

                    v.

H & R BLOCK EASTERN TAX
SERVICES, INCORPORATED; H&R
BLOCK TAX SERVICES, INCORPORATED,
                    *Defendants-Appellants.*

FRANK GRIM,
                              *Movant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CA-00-51)

Argued: November 1, 2001

Decided: January 10, 2002

Before NIEMEYER, WILLIAMS, and GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Gregory Neil Stillman, HUNTON & WILLIAMS, Norfolk, Virginia, for Appellants. Carl Jay Khalil, Corporate Counsel, JTH TAX, INC., Virginia Beach, Virginia, for Appellees. **ON BRIEF:** Benita W. Ellen, HUNTON & WILLIAMS, Norfolk, Virginia; N. Louise Ellingsworth, Mark W. Brennan, BRYAN CAVE, L.L.P., Kansas City, Missouri, for Appellants.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

JTH Tax, Inc. d/b/a Liberty Tax Service and thirteen of its franchisees (collectively, "Liberty") brought this suit against H & R Block Tax Services, Inc. and H & R Block Eastern Tax Services, Inc. (collectively, "Block"), a competing tax preparation service provider, alleging that Block had engaged in false and deceptive advertising in connection with its offering of a new loan product during the 2000 tax season in the Hampton Roads area of Virginia, in violation of the Lanham Act, 15 U.S.C. § 1111-1127 (West 1998 & Supp. 2000) (the "Act"). Following a bench trial, the district court awarded Liberty $506,477 in Block's profits, plus $314,898.69 in attorneys' fees and costs. The court additionally enjoined Block from engaging in certain advertising practices. In this consolidated appeal, Block challenges (a) the court's finding that Block acted willfully; (b) the court's finding of materiality; (c) the court's award of profits; (d) a portion of the court's injunctive relief; and (e) a portion of the court's award of

attorneys' fees and costs. We affirm in part, vacate in part, and remand in part.

## I.

### A.

For a fee, Block, a leading tax preparation service provider, enables taxpayers to file their tax returns electronically, and thus to receive their actual tax refunds from the Internal Revenue Service ("IRS") within approximately two weeks. Block also offers a product termed a "refund anticipation loan" ("RAL"), which enables taxpayers to obtain, through Block's partnered lending institutions, short-term loans against the anticipated amounts of their tax refunds within approximately two days.[1] RALs require the fulfillment of certain conditions and subject borrowers to certain obligations that tax refunds do not. Taxpayers seeking RALs, for example, must endure a loan application process requiring extensive certifications and declarations, including those regarding past bankruptcies and current outstanding debts. RAL borrowers also may be subjected to collection costs and attorneys' fees where their actual tax refunds are insufficient to cover the amounts of their corresponding loans. In addition, RAL borrowers must agree to "cross-collection" of delinquent loans from other banks.

Block has experienced difficulties in marketing the RAL product. Several states sued Block in the 1990s for engaging in deceptive advertising by concealing the fact that RALs were loans. In July 1993, for instance, Block signed a consent decree with the state of Connecticut under which it agreed not to misrepresent loans as refunds or to use the term "rapid refund" to describe RALs. Block entered into similar agreements with the states of Florida and New York in January 1994 and January 1997, respectively.

During the 2000 tax season, Block offered a slightly modified loan product, a "no additional cost refund anticipation loan" ("NACRAL"),

---

[1]An RAL borrower receives a check equivalent to the amount of the approved loan, less tax preparation fees, interest fees, and other applicable bank fees. The IRS later sends the actual tax refund directly to the applicable lending institution.

in selected areas across the country. Unlike traditional RALs, NACRALs feature no interest and no fees.[2] NACRALs, however, are identical to RALs in every other respect: they required the submission of loan applications and the making of significant certifications, and they expose borrowers to potential collection costs, attorneys' fees, and cross-collection efforts.

Block identified the Hampton Roads area of Virginia, where it owned and operated approximately thirty-one offices, as a primary target market for the rollout of the NACRAL product during the 2000 tax season. Liberty, a company theretofore operating approximately thirty-five offices in the United States, had no offices in the Hampton Roads area as of the 1999 tax season, but launched twenty-five new offices there in a heavily publicized effort prior to the 2000 tax season.

Notwithstanding its earlier legal troubles arising from the marketing of RALs as "refunds," Block advertised the NACRAL in Hampton Roads through posters, newspapers, radio and television commercials, and direct mailings as a "refund," "refund amount," and "a check in the amount of your refund." Block undertook these efforts in the face of an IRS Revenue Procedure ("Publication 1345") requiring tax preparation service providers, in advertising RALs, to make "clear in the advertising that the taxpayer is borrowing against the anticipated refund and not obtaining the refund itself from the financial institution." IRS Pub. 1345, § 12.09, Rev. Proc. 98-50, 1998 WL 638827. None of Block's Hampton Roads NACRAL advertisements complied with Publication 1345.

Block's Hampton Roads NACRAL marketing campaign was a resounding success. The number of returns Block processed in that area jumped 24.8% from 1999 to the year 2000, whereas the number of returns Block processed in other areas of Virginia increased only 0.8% during the same period. The evidence shows that Liberty, meanwhile, struggled to keep pace with Block, at times offering free tax preparation services in an effort to compete.

---

[2]Block pays the interest and other lending fees directly to the applicable bank.

B.

On June 14, 2000, Liberty filed an amended complaint in the Eastern District of Virginia, alleging that Block had engaged in false and misleading advertising in violation of the Act, 15 U.S.C. § 1125(a). Following a bench trial, the district court, Judge Jackson found one of Block's advertisements to be literally false, deemed several others true but misleading, and found still others non-actionable. *See JTH Tax, Inc. v. H & R Block Eastern Tax Services, Inc.*, 128 F.Supp.2d 926, 935-37 (E.D. Va. 2001). The court also found that Block had acted "willfully, maliciously, and in bad faith," reasoning that Block was aware of the prohibition embodied in Publication 1345 against advertising loans as refunds when it executed its 2000 Hampton Roads marketing campaign; Block's agreements with the states of Connecticut, Florida, and New York made clear that Block specifically had been placed on notice that representing loans as refunds was deceptive and improper; Block deliberately targeted Liberty, a newcomer to the Hampton Roads market, with its deceptive advertising campaign; and an internal Block "Rapid Refund Awareness Study," favoring the use of the word "refund" over the use of the word "loan," indicated an "absence of mistake" on Block's part regarding the effect of the use of the term "refund" on consumers. *See id.* at 933.

Finding the evidence insufficient to support an award of Liberty's actual damages, the court instead awarded Liberty $506,477 in Block's profits. The court also awarded Liberty $314,898.69 in attorneys' fees and costs, including $38,619.50 in fees and $2,730.20 in costs that Liberty had paid to a law firm that Block argued had violated the Virginia Rules of Professional Conduct by representing Liberty in the instant litigation. The court additionally enjoined Block from advertising in violation of Publication 1345; referring to loan disbursements as "advances," "refund amounts," or checks "in the amount of your refund," unless Block makes clear that the product is a loan; and using the term "rapid refund" in connection with loan products. Block now challenges several aspects of the district court's decision.

II.

Block first challenges the district court's factual finding that Block acted with malice, asserting that none of the court's subsidiary find-

ings properly supports an inference that Block acted willfully. As noted above, the district court found that (1) the consent decrees are competent evidence of Block's prior knowledge that representing a NACRAL as a refund would be unlawful; (2) Block's failure to comply with Publication 1345 evidences deliberate misconduct; (3) the circumstances surrounding Liberty's heavily publicized entry into the Hampton Roads market and Block's targeted NACRAL campaign demonstrate that Block deliberately targeted Liberty; and (4) the internal Block report indicates "an absence of mistake" concerning the effect on consumers of the use of the word "refund" to describe loan products. We conclude that the former two findings alone sufficiently support the district court's finding of malice.

It is well established that a trial judge's findings of fact are reviewed for clear error. Fed. R. Civ. P. 52(a). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573 (1985) (internal quotation omitted). "If the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573-74.

Block disputes the district court's use of the consent decrees to infer that it willfully engaged in false and misleading advertising. Block first points out that it never suffered an adverse adjudication concerning its RAL advertising practices. Block additionally argues that the consent decrees, which were borne of concern regarding Block's advertising of interest-bearing RALs, cannot serve as the basis for the conclusion that Block deliberately engaged in false and misleading advertising of NACRALs, because by extracting interest and bank fees from the traditional RAL product in the process of creating the NACRAL product, Block actually eliminated the concerns that gave rise to, and are embodied in, the consent decrees. We find these contentions unpersuasive.

An attentive reading of each consent decree reveals a shared, simply described purpose: to halt Block's practice of misrepresenting

loans as refunds. The foundational provisions of each decree evince a general concern, not only for protecting consumers from unwittingly incurring interest and bank fees, but for protecting consumers generally from unknowingly subjecting themselves to the full complement of detriments and obligations endemic to loan transactions.[3] A number of the decrees' more specific provisions likewise reflect a concern for ensuring that the disclosure of RALs' loan characteristics other than the charging of interest and traditional bank fees would occur.[4] At bottom, this concern reflects a recognition that insufficient disclosure of these non-interest, non-fee characteristics threatens the welfare of consumers and the marketplace.

It is plain that NACRALs, identical as they are to RALs in all respects save the charging of interest and other traditional bank fees, pose the same threat to consumers and the marketplace, at least insofar as the RALs' and NACRALs' shared characteristics are concerned. It is equally plain that Block, in modifying its RAL product to create the NACRAL product, failed to eliminate all of the concerns animating the consent decrees. Thus, the fact that Block advertised NACRALs as "refunds," "refund amounts," and checks "in the amount of your refund" on the heels of its repeated representations by way of the consent decrees that it would no longer misrepresent loan

---

[3]The main provision of the Florida decree, for example, provides that whenever Block advertises a RAL, it "may not directly or indirectly represent such loan as a refund," and that Block "will disclose to taxpayers that [RALs] in fact are loans and not a substitute for or a quicker way of receiving an income tax refund." (J.A. at 690.) The Connecticut decree similarly provides that Block "shall disclose to taxpayers that [RALs] are, in fact, loans and not a substitute for or a quicker way of receiving an income tax refund," and that whenever Block advertises a RAL, "it may not directly or indirectly represent such loan as a refund." *Id.* at 766-67.

[4]Thus, the Florida decree requires Block to "prominently display . . . a sign disclosing to consumers . . . withholding procedures, [and] expected time frames for payment of loans." *Id.* at 691. The New York decree similarly requires Block to disclose any features of an RAL that "could cause the consumer to be approved for a [RAL] for an amount less than the consumer's full anticipated refund . . . [and] the expected time delay for the receipt by the consumer of the balance of the consumer's actual refund." (J.A. at 701.).

products as refunds amply supports the district court's conclusion that Block conducted its NACRAL advertising campaign in bad faith. The fact that no prior judgment was entered against Block is simply irrelevant.

Block's contention that the district court erroneously relied on Block's failure to comply with Publication 1345 fails for strikingly similar reasons. Block's primary contention is that Publication 1345 aims solely at prohibiting e-file providers from misrepresenting interest-bearing loans as refunds. Because, according to Block, it believed that NACRALs, which do not bear interest, did not constitute RALs for purposes of the requirements of Publication 1345, that regulation cannot possibly serve as a basis for a finding that Block intentionally misled potential NACRAL consumers by advertising them as "refunds," "refund amounts," and the like.

Publication 1345 in relevant part provides:

> *A Refund Anticipation Loan (RAL) is money borrowed by the taxpayer from a lender based on the taxpayer's anticipated refund amount.* . . . All parties to RAL agreements, including [providers such as Block], must ensure that taxpayers understand that RALs are interest bearing loans and not substitutes for a faster way of receiving refunds.

> . . . .

> In advertising the availability of a RAL, an Authorized *e-file* Provider and a financial institution must clearly (and, if applicable in easily readable print) refer to or describe the funds being advanced as a *loan, not a refund*; that is, it must be made clear in the advertising that the taxpayer is *borrowing against the anticipated refund and not obtaining the refund itself from the financial institution.*

IRS Pub. 1345, Ch. 3 & § 12.09, Rev. Proc. 98-50, 1998 WL 638827. (emphases added).

Although Publication 1345 at one point refers to RALs as "interest bearing loans," the first portion of the regulation clearly provides a

baseline definition under which the charging of interest is neither a necessary nor a sufficient component. In defining RALS as "money borrowed by the taxpayer from a lender based on the taxpayer's anticipated refund amount," the IRS clearly brought NACRALs and other similar products within the regulation's ambit. Moreover, by making no mention of interest in the more affirmative provisions concerning the manner in which e-file providers must advertise RALs, Publication 1345 evinces a broad purpose to prohibit e-file providers from blurring the lines between loans and refunds, irrespective of whether the loans at issue require the payment of interest. Because the reach of Publication 1345 extends beyond mere interest-bearing loans to those, such as NACRALs, involving short-term borrowing against taxpayers' anticipated refunds but no interest charges, it was more than reasonable for the district court to find that Block's NACRAL advertisements, which were disseminated in violation of the strictures of Publication 1345, revealed a deliberate intent to mislead consumers and unfairly compete in the marketplace.

In view of Block's history of affirmatively representing in multiple state consent decrees that it would refrain from advertising RAL products in a misleading manner; the public nature of the provisions set forth in Publication 1345, requiring Block to do the same; the largely identical character of the RAL and NACRAL products; and the nature of Block's 2000 Hampton Roads NACRAL advertising campaign, we have little trouble concluding that the district court's conclusion that Block acted maliciously, willfully, deliberately, and in bad faith in conducting that advertising campaign was more than reasonable. In so concluding, we are ever mindful that the district court's conclusion need only be "plausible in light of the record reviewed in its entirety." *Anderson*, *supra*, 470 U.S. at 573. Upon a thorough review of the record before us, we cannot fairly say that the court's conclusion was clearly erroneous.

### III.

Block next challenges the district court's factual finding of materiality. To recover under the Act, a plaintiff must demonstrate, inter alia, that the false or misleading advertisements at issue were "material" in that they were "likely to influence the purchasing decision." *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir.

1998); J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 27:35 (4th Ed. 2001). The district court rejected Block's argument that because the NACRAL includes no interest or fees, the deception involved in advertising a NACRAL as a "refund," "refund amount," or a check in "the amount of your refund" is immaterial. The court first found that Liberty had presented probative evidence that NACRALs entail several unattractive features associated with loans. The court then found that Liberty's marketing expert, Dr. Myron Glassman ("Dr. Glassman"), offered probative causality evidence by way of a consumer survey. The court pointed out that 21.7% of those surveyed under Dr. Glassman's direction indicated that use of the phrase "refund amount" would be more effective than use of the term "loan," precisely because the former language communicated the impression that the product advertised was not a loan. From this evidence, the court drew the "clear inference" that the deception was material in that consumers prefer a refund over any type of loan product, including a NACRAL.

Block essentially challenges Dr. Glassman's survey as being irrelevant. The fatal flaw, according to Block, is that the survey failed to alert its respondents to those characteristics that NACRALs and RALs do not share, i.e., the fact that no interest or bank fees are charged in conjunction with a NACRAL. We disagree and conclude that while Dr. Glassman's survey could have been designed more precisely, the survey's results are sufficient to establish that representing a loan product as a "refund amount" would affect a reasonable consumer's purchasing decision.

The survey tends to show that consumers associate loans with a bundle of unfavorable conditions and obligations, many of which have nothing to do with the payment of interest. It thus was reasonable for the district court to find that using terms such as "refund" or "refund amount" to advertise a non-interest-bearing loan such as a NACRAL would affect a reasonable consumer's decision making process. Although Block's view of the evidence on this point is reasonable, where, as here, "there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Scrimgeour v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir. 1998). In short, one of at least two permissible views of Dr. Glassman's survey supports the conclusion that Block's misrepresen-

tation of NACRALs is material to consumers' purchasing decisions. The court's reliance on Dr. Glassman's survey therefore was not clearly erroneous.

IV.

Block raises numerous challenges to the district court's $506,477 award of Block's profits, two of which merit attention here. First, Block disputes the court's use of its gross revenues rather than its net profits to calculate the award, notwithstanding the introduction of competent evidence as to Block's costs. Second, Block maintains that the court erred in neglecting to reduce future profits to present value. On both scores, we agree.

The Act provides that a prevailing plaintiff:

> shall be entitled, subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. . . . If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C.A. § 1117(a) (West 1998 & Supp. 2000). An award of profits under the Act is committed to the discretion of the district court; we therefore review for an abuse of discretion. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998).

The district court found that during the 2000 tax season Block increased by 24.8% the number of returns it processed in Hampton Roads, in contrast to a 0.8% increase in those areas of Virginia where Block refrained from running its false and misleading ads. The court thus found that Block's NACRAL campaign was a success in that it

provided an increased client base for future tax preparation services and increased cross-marketing opportunities for its mortgage and financial services.[5] Relying on expert testimony, the court concluded that, excluding the 0.8% increase in customers in non-NACRAL areas of Virginia, Block serviced an additional 9,446 returns as a result of its false and misleading ads.

Excluding the presence of other potential injured parties as unsupported by Block's evidence, the court determined that the relevant sphere of Block competitors included seventy Jackson-Hewitt offices and seventeen Liberty offices.[6] The court then used its "equitable discretion" to quantify Liberty's market share at 18%, resulting in a determination that Block had improperly obtained 1,700 taxpayer returns vis-a-vis Liberty. Using an "average fee per client" of $83.22, the court calculated Block's immediate gains at $141,474.

Seizing upon an expert's report indicating that nearly 43% of Block's tax clients showed an interest in additional services, the court used this figure as an "equitable proxy" for that percentage of the 1,700 clients Block had improperly obtained vis-a-vis Liberty that would use Block's services in the future. Thus, the court found that 731 of Block's unjustly obtained clients would remain Block clients in future years. Relying again on an expert report indicating that the "average retention of a client" is six years, the court determined that Block effectively would be enriched by an amount equal to the product of Block's "average fee per client" and the number of long-term clients improperly retained, 731, over a period extending six years beyond the 2000 tax season. The court thus concluded that Block would pocket an additional $365,003 in profits over that six-year period. Combining this quantum of profits with the $141,474 in prof-

---

[5]The court specifically found that the dramatic increase in returns related primarily to Block's false and misleading advertising tactics rather than its bundled pricing format. *See JTH Tax, Inc.*, 128 F.Supp.2d at 945 n.16.

[6]The court found that only seventeen of the nineteen relevant Liberty offices were fully operational during the 2000 tax season. *See JTH Tax, Inc.*, 128 F.Supp.2d at 945 n.17.

its attributable to the 2000 tax season, the court awarded Liberty $506,477 in Block's profits.[7]

The plain language of the Act clearly indicates that a defendant's "profits" are to be calculated by reducing the amount of the defendant's "sales" by appropriate "elements of cost or deduction," so long as the defendant proves those elements. *See* 15 U.S.C.A. § 1117(a). One of Block's experts testified that for the ten month period ending on February 29, 2000, Block earned average revenues per tax return in the amount of $95.92; its per return costs came to $67.85; and the resulting net earnings per return amounted to $28.07. (J.A. at 594-96, 1234.) The district court, while purporting to enter an award of Block's "profits," inexplicably neglected to address Block's evidence of costs, awarding Block's gross revenues instead.

While the district court had the discretion under the Act to enter judgment for a sum it deemed just if it found under the circumstances that an award of Block's profits was "inadequate," there is no indication that this is what the court did. Rather, it appears that the court simply erred in applying the terms of the Act and its own formula. We therefore hold that the court abused its discretion in awarding Block's profits insofar as it failed to consider evidence of Block's costs.

Block also contends that the district court erred in failing to reduce to present value the portion of its award attributable to profits the court projected Block would earn over the six-year period following the 2000 tax season. It is well established that "damages awards in suits governed by federal law should be based on present value." *St. Louis Southwestern Railway Co. v. Dickerson*, 470 U.S. 409, 412 (1985); *see also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536-37 (1983) (where interest safely may be earned upon the amount awarded to an injured party, the ascertained future benefits should be discounted to their present value). Here, the court failed to discount that portion of the award attributable to Block's future profits. Absent a finding that a conventional award of Block's future prof-

---

[7]The court denied, however, Liberty's request for "damages sustained by the plaintiff" under the Act on the ground that any such damages were unreasonably difficult to quantify due to the lack of comparative historical data. *See JTH Tax, Inc.*, 128 F.Supp.2d at 945-46.

its — i.e., one that reduced such profits to present value — was inadequate, the award constituted a windfall to Liberty and unnecessarily penalized Block. We therefore additionally hold that the court's failure to consider the effect of the time value of money on the portion of its award attributable to profits Block was projected to earn in future years was an abuse of discretion.

In accordance with the foregoing, we vacate the award of profits and remand for recalculation.

## V.

Block also maintains that the injunction entered against it is overbroad insofar as it enjoins the use of its "rapid refund" mark. We agree and reverse that portion of the court's order. The Act vests district courts with the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to . . . prevent a violation under [§ 1125(a)]." 15 U.S.C.A. § 1116(a) (West 1998 & Supp. 2000). It is well established, however, "that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Forschner Group v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997); *see also Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990), *costs/fees proceeding, on remand*, 778 F.Supp. 555 (D.D.C. 1991), *amended*, 1991 U.S. Dist. LEXIS 17326 (D.D.C. Dec. 3, 1991), *aff'd in part and rev'd in part, remanded*, 997 F.2d 949 (D.C. Cir. 1993) ("The law requires that courts closely tailor injunctions to the harm that they address."); *see generally*, 4 McCarthy § 30:3 (discussing the tailoring of an injunction to the specific case).

We conclude that the injunction against the use of the "rapid refund" mark exceeds the court's power to fashion an effective remedy. In enjoining certain of Block's advertising practices, the district court ostensibly sought to prohibit it from misleading consumers to believe that NACRALs are something other than loans. The first two prongs of the injunctive relief awarded in the district court adequately address this goal by prohibiting Block from advertising in violation of Publication 1345, and from using specified phrases, such as "refund amount," without clearly informing the consumer that the adver-

tised product is in fact a loan. In the context of this case, there is nothing intrinsically harmful about the "rapid refund" mark itself that is not otherwise addressed in the first two prongs of injunctive relief. *See JTH Tax, Inc.*, 128 F.Supp.2d at 952 (granting three forms of injunctive relief). Consequently, redressing the harm that Block's false and misleading advertising has caused does not require a blanket prohibition on the mark's use in connection with loan products. We therefore vacate that portion of the injunctive relief prohibiting Block from using "the term or mark 'rapid refund' in connection with loan products, whether or not fees or interest are charged," *id.*, and remand for removal of that element of relief.

## VI.

Block finally disputes a portion of the district court's award of attorneys' fees and costs, arguing that the court erred by ordering Block to pay to Liberty fees and costs incurred by one of Liberty's law firms that eventually withdrew from representation after a dispute arose concerning whether or not the firm had violated the Virginia Code of Professional Responsibility.[8] For reasons discussed briefly below, we affirm the district court's award of attorneys' fees and costs.

Block argues that the representation Willcox & Savage ("Willcox") provided to Liberty in this case violated the Virginia Rules of Professional Conduct, thereby making an award of attorneys' fees and costs improper. We disagree. In 1994, Willcox represented Block in a matter involving claims of false advertising of tax preparation services under the Act. As a result, Block contends, Willcox's representation of Liberty in the instant matter violated Rule 1.9(a) of the Virginia Rules of Professional Conduct.[9] During the pendency of the instant

---

[8]Block's separate appeal on this issue has been consolidated with the underlying case for purposes of our review.

[9]Rule 1.9(a)provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless both the present and former client consent after consultation." Va. R. Prof'l Conduct 1.9(a) (2000).

action, Willcox also was counsel of record for Block in a Virginia state court matter that remained on the court's docket despite the fact that no filing or pleading had been received from the plaintiffs for a lengthy period. Block thus maintains that Willcox's representation of Liberty independently violated Rule 1.7(a) of the Virginia Rules of Professional Conduct.[10] Block therefore argues that the portion of the district court's award of attorneys' fees attributable to Willcox's services is improper and should be reversed.

The district court found that Block was not an "existing client" of Willcox within the meaning of Rule 1.7(a), reasoning that the matter had been sufficiently dormant to make Willcox's duties to Block purely "ministerial." (J.A. at 1500-01.) The court also found, however, that the false advertising matter in which Willcox previously had represented Block was "substantially related" to the instant litigation, concluding that Willcox's current representation of Liberty therefore violated Rule 1.9(a). Nonetheless, the court concluded that Block had suffered no prejudice, and thus that no equitable remedy should be had. Instead, the court held, "the appropriate remedy is for [Block] to refer [Willcox] to the Virginia State Bar for its violation of Rule 1.9(a)." (J.A. at 1499.) In the court's view, this approach "serve[d] the Lanham Act's goal of deterrence as well as the disciplinary goals of Virginia's Rules of Professional Conduct." *Id.* at 1500.

Relying on *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354 (9th Cir. 1998), Block argues on appeal that because Willcox breached its duty of loyalty to Block in its representation of Liberty, it was reversible error to award Liberty fees and costs attributable to Willcox's representation. In *Image Technical*, the Coudert Brothers law firm represented the plaintiff, Image Technical Service, Inc., against Kodak in an antitrust action. Kodak moved to disqualify Coudert Brothers because the firm had represented a division of Kodak in other matters, and the district court granted the motion. After the plaintiff prevailed at trial, the court awarded it attor-

---

[10]Rule 1.7(a) provides: "A lawyer shall not represent a client if the representation of that client will be directly adverse to another existing client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation." Va. R. Prof'l Conduct 1.7(a) (2000).

neys' fees, including $400,000 for Coudert Brothers' representation. On appeal, Kodak argued that it should not be required to pay any amount to Image Technical for Coudert Brothers' representation. The Ninth Circuit held that Kodak could not be required to pay the fees of conflicted counsel for their services to the prevailing party:

> [A] law firm representing the antitrust plaintiffs simultaneously represented the antitrust defendant, a clear violation of the applicable ethics rules. Image Technical is under no obligation to pay any fees to the law firm, Coudert, for its conflicted representation. Absent some representation that Image Technical, the party requesting fees, will not retain the $400,000, it stands to receive a sizeable windfall. And if Image Technical does not retain the $400,000 and pays Coudert, Coudert will receive compensation which California law says it cannot recover.

> If Coudert had breached a duty of loyalty to Image Tech only, there would be a better argument for allowing Image Tech to recover and retain the fees. The $400,000 would not be so much a windfall as recompense for conflicted representation. Here, however, it compounds injustice to allow Image Tech to receive $400,000 from Kodak, the party injured by the ethical violation. Moreover, it is less of a concern that Kodak, as the defendant potentially liable for the fees, will receive a windfall if it is not ordered to pay Image Tech the fees, because Kodak is the client injured by Coudert's breach of its duty of loyalty when it simultaneously represented Kodak and Image Tech.

*Image Technical*, 136 F.3d at 1359.

The primary difference between *Image Technical* and the case before us is that Liberty already has paid Willcox's fees and the costs incurred in connection with Willcox's representation. In *Image Technical*, the plaintiff had yet to pay offending counsel its fees, and the court thus was appropriately concerned that a fee award either would provide compensation to conflicted counsel in violation of California law or bestow a sizeable windfall on the plaintiff. We face no such dilemma. Even assuming Willcox has violated one or more of Virgin-

ia's Rules of Professional Conduct, the court's fee award has no bearing on the question of whether conflicted counsel will be paid for its services, for Willcox already has been paid. Neither does the fee award in this case constitute a windfall to the plaintiff, for Liberty merely seeks compensation for fees it already has parted with.

Consequently, an award of attorneys' fees and costs here does nothing more than fairly compensate a prevailing plaintiff against a defendant found to have engaged in willful misconduct under federal law. If Block seeks a remedy for conflicted representation, that remedy is most appropriately sought by filing a complaint with the Virginia State Bar, or by filing suit against Willcox under the applicable law. For these reasons, the district court's award of attorneys' fees and costs is hereby affirmed.

## VII.

We affirm the district court's finding that Block acted willfully in violating 15 U.S.C. § 1125(a). We also affirm the court's finding that Block's false and misleading advertisements were material to a reasonable consumer's purchasing decision. In addition, we affirm the court's award of attorneys' fees and costs. We vacate the court's award of Block's profits and remand for the court to redetermine the damages to which Liberty is entitled under 15 U.S.C. § 1117(a). We additionally vacate that portion of the injunction prohibiting Block from using "the term or mark 'rapid refund' in connection with loan products, whether or not fees or interest are charged," and remand for removal of that element of injunctive relief.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*